# IN THE SUPREME COURT OF CALIFORNIA

ALAMEDA COUNTY DEPUTY SHERIFF'S ASSOCIATION
et al.,

Plaintiffs and Appellants,

v.

ALAMEDA COUNTY EMPLOYEES' RETIREMENT
ASSOCIATION et al.,

Defendants and Respondents;

STATE OF CALIFORNIA et al.,

Interveners and Appellants.

\* \* \* \*


CONTRA COSTA COUNTY DEPUTY SHERIFF'S
ASSOCIATION et al.,

Plaintiffs and Appellants,

v.

CONTRA COSTA COUNTY EMPLOYEES' RETIREMENT
ASSOCIATION et al.,

Defendants and Respondents;

STATE OF CALIFORNIA et al.,

Interveners and Appellants.

\* \* \* \*

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES et al.,

Plaintiffs and Appellants,

v.

MERCED COUNTY EMPLOYEES' RETIREMENT ASSOCIATION et al.,

Defendants and Respondents;

STATE OF CALIFORNIA et al.,

Interveners and Appellants.


S247095


First Appellate District, Division Four

A141913


Alameda County Superior Court

RG12658890

Contra Costa County Superior Court

MSN12–1870

Merced County Superior Court

CV003073

July 30, 2020

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Chin, Corrigan, Liu, Cuéllar, Kruger, and Groban concurred.

Justice Cuéllar filed a concurring opinion.

ALAMEDA COUNTY DEPUTY SHERIFF'S ASSN. v.
ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSN.

S247095


Opinion of the Court by Cantil-Sakauye, C. J.


The California Public Employees' Pension Reform Act of 2013 (PEPRA; Stats. 2012, ch. 296, § 1) substantially revised the laws governing the pension plans of the state's public employees. In a prior decision, *Cal Fire Local 2881 v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965 (*Cal Fire*), we rejected a constitutional challenge to one change effected by PEPRA, the elimination of the opportunity for public employees to purchase "additional retirement service credit" under Government Code section 20909. The present decision addresses legal issues raised by a different provision of PEPRA, which amended the County Employees Retirement Law of 1937 (CERL; Gov. Code, § 31450 et seq.).[1]

CERL governs the pension systems maintained by many of the state's counties. Each county system is administered by

---

[1]     Unless indicated otherwise, all further statutory citations are to the Government Code.

We use the abbreviation "PEPRA" in its popular sense to refer to Assembly Bill No. 340 (2011-2012 Reg. Sess.) (Assembly Bill 340), which enacted the amendment under consideration here. (Stats. 2012, ch. 296, § 28.) Assembly Bill 340 formally gave the name "California Public Employees' Pension Reform Act of 2013" only to newly added article 4 of Chapter 21 of the Government Code, which spans sections 7522 – 7522.74. (Stats. 2012, ch. 296, § 15.)

its own retirement board, which is tasked with implementing CERL's provisions.  Under CERL, the amount of an employee's pension benefit is determined as a percentage of the "compensation earnable" received by the employee during a representative year of county employment.  Even before PEPRA, CERL expressly excluded overtime pay from compensation earnable and limited the inclusion of payments from a deferred compensation plan.  The PEPRA provision at issue here amended CERL's definition of compensation earnable to exclude or limit the inclusion of additional types of compensation in an effort to prevent perceived abuses of the pension system. Although this amendment applies to the calculation of the pensions of all employees covered by CERL, the parties agree that the issues raised in this appeal relate only to the amendment's impact on the pensions of persons who were first employed by a county prior to the effective date of PEPRA, referred to as "legacy employees."

This challenge to PEPRA's amendment of CERL raises two sets of issues.  First, the Alameda County Deputy Sheriff's Association (Association) and its coplaintiffs (collectively, plaintiffs) contend that employees in the three counties involved in this matter have a contractual right to receive pension benefits calculated without regard to PEPRA's changes, a right based either on (1) agreements in effect when PEPRA was enacted or (2) application of the doctrine of equitable estoppel.[2]

---

[2]     As explained below, this matter resulted from the consolidation of three separate lawsuits filed by organizations representing employees of Alameda, Contra Costa, and Merced Counties.  Among the plaintiffs in these actions, only those in

Long prior to the passage of PEPRA, employees in each of these counties had entered into litigation settlement agreements with their respective retirement boards that specify the types of compensation included in compensation earnable. In some cases, the provisions added by PEPRA conflict with the terms of these agreements, excluding or restricting items of compensation that the agreements require to be included in compensation earnable. Plaintiffs argue that these agreements confer on existing employees the contractual right to continue to include these items of compensation in their pensionable compensation, notwithstanding their exclusion by the provisions added by PEPRA, or, alternatively, that the counties are equitably estopped from implementing the PEPRA amendment in a manner inconsistent with the agreements. In turn, Central Contra Costa Sanitary District (District) and the State of California (State) (collectively, defendants) respond that the retirement boards are required to implement the provisions of CERL, including PEPRA's amendment, notwithstanding any contrary agreements they might have entered into with county employees.[3]

_____

the Alameda County action petitioned this court for review of the Court of Appeal's decision. The plaintiffs in the Contra Costa and Merced actions filed respondents' briefs in this court advancing positions similar to those of the Association and its coplaintiffs.

[3] In addition to the petition for review filed by the Association, we granted petitions for review filed by both the District and the State. The District had been joined as a defendant in the Contra Costa County action because its employees participate in a CERL pension plan. Although not

3

Wholly apart from these ordinary contract issues, plaintiffs also contend that county employees who began their work prior to PEPRA's enactment have a constitutional right to receive pension benefits calculated according to the law as it existed prior to PEPRA. Since at least the middle of the last century, our precedents have granted constitutional protection to public employee pension plans. Under the "California Rule," as it has come to be known (*Cal Fire*, *supra*, 6 Cal.5th at p. 971), the contract clause of the state Constitution requires any modification of public employee pension plans to satisfy a standard established in a long line of California Supreme Court decisions, including most prominently *Allen v. City of Long Beach* (1955) 45 Cal.2d 128 (*Allen I*). As explained below, in determining the constitutional validity of a modification to a public employee pension plan, *Allen I* requires a court first to determine whether the modification imposes disadvantages on affected employees, relative to the preexisting pension plan, and, if so, whether those disadvantages are accompanied by comparable new advantages. Assuming the disadvantages are not offset in this manner, the court must then determine whether the agency's purpose in making the changes was sufficient, for constitutional purposes, to justify an impairment of pension rights. Public employee pension plans may be modified "for the purpose of keeping [the] pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system," but to survive contract clause scrutiny, such changes

_____

initially a party, the State was permitted to intervene in all three of the consolidated actions to defend PEPRA.

"must bear some material relation to the theory of a pension system and its successful operation." (*Id.* at p. 131.) Finally, assuming the changes occurred for a constitutionally permissible purpose, we interpret *Allen I* to require the modification to provide comparable new advantages to public employees unless to do so would undermine, or would otherwise be inconsistent with, that proper purpose.

Invoking the contract clause, plaintiffs argue that persons employed by a county at the time of PEPRA's enactment possessed implied contractual rights in the pre-PEPRA terms of CERL that are protected against impairment. Because PEPRA's amendment has the practical effect of diminishing some employees' pension benefits without granting any comparable new advantages, plaintiffs contend, its application to the pensions of existing employees is precluded by the California Rule. In turn, defendants respond that (1) PEPRA's amendment did not trigger constitutional scrutiny because its provisions constituted a clarification, rather than a modification of CERL, and, alternatively, (2) any changes met the requirements of the California Rule.

With regard to the ordinary contract issues, we hold that county employees have no express contractual right to the calculation of their pension benefits in a manner inconsistent with the terms of the PEPRA amendment. Because the county retirement boards are required to implement CERL as enacted by the Legislature, the settlement agreements, which are silent on this issue, must be interpreted to permit the modification of board policies to accommodate statutory changes to CERL. In addition, we conclude that plaintiffs have failed to demonstrate the elements necessary for the invocation of equitable estoppel.

In particular, there is no evidence that the county boards made any representations regarding the continued enforceability of the terms of the settlement agreements in the event of inconsistent legislative changes to the controlling statutory provisions.

With regard to the constitutional question, we reject defendants' threshold argument that no constitutional issue is presented here because the exclusions and limitations from compensation earnable imposed by PEPRA did not constitute a change in the law governing CERL pension benefits. Although the inclusion in compensation earnable of the elements of compensation excluded by PEPRA had not been specifically addressed when the amendment was enacted, either in CERL itself or its judicial interpretations, the more general law of compensation earnable was sufficiently settled prior to PEPRA to justify treating the amendment as a change in the law for purposes of contract clause analysis. With respect to the merits of plaintiffs' constitutional claim, however, we hold that the challenged provisions added by PEPRA meet contract clause requirements. They were enacted for the constitutionally permissible purpose of closing loopholes and preventing abuse of the pension system in a manner consistent with CERL's preexisting structure. Further, it would defeat this proper objective to interpret the California Rule to require county pension plans either to maintain these loopholes for existing employees or to provide comparable new pension benefits that would perpetuate the unwarranted advantages provided by these loopholes.

## I. BACKGROUND

CERL establishes an optional employee pension system for county adoption. Of our state's 58 counties, 20 have chosen to implement their pension plans under CERL. (*Irvin v. Contra Costa County Employees' Retirement Assn.* (2017) 13 Cal.App.5th 162, 169, fn. 6.) The remaining counties either operate an independent retirement system or contract with the state's pension plan, the Public Employees' Retirement System (CalPERS; § 20000 et seq.). (*Irvin*, at p. 169, fn. 6.) Because the legislation at issue here applies only to CERL, the pensions of persons employed by counties that do not participate in CERL are not directly affected by our decision. For convenience, our subsequent references to "counties" and "county employees" in this decision should be understood to refer only to counties that maintain a pension plan under CERL and persons employed by those counties.

In addition, as noted above, the arguments raised by the parties apply only to county employees who were employed prior to PEPRA's effective date. PEPRA made substantial changes in the law applicable to the pensions of public employees hired after its effective date that are not applicable to the pensions of legacy public employees, but none of those changes is at issue here. Again for convenience, unless stated otherwise, references to "county employees" in the remainder of this decision include only persons who were first employed by a county prior to PEPRA's effective date. Similarly, our description of the provisions of CERL addresses only those provisions applicable to such legacy employees. Employees hired post-PEPRA are often subject to alternate statutory provisions, and, as a general matter, we do not address those provisions.

### A. County Employee Pensions Under CERL

CERL contains a collection of alternative pension provisions tailored to individual counties and subsets of workers within those counties. (See, e.g., §§ 31486, 31487, 31496, 31499, 31511, 31676.01–31676.19.) Notwithstanding this tailoring, the county plans are identical in their general approach, although the details in the following description vary among them.

Each county maintains its own pension plan, administered by a retirement board whose general membership is dictated by statute. (§§ 31520, 31520.1; see *Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1095–1096 [discussing the composition of retirement boards].) Under the California Constitution, such retirement boards have "plenary authority and fiduciary responsibility for investment of moneys and administration of the system." (Art. XVI, §17.) Both the county and its employees must make regular contributions to their plan's pension fund in amounts determined by the county board of supervisors, upon recommendation of the retirement board. (§§ 31453, 31453.5, 31454, 31621.)

In general terms, a county employee becomes eligible to retire after he or she has worked for the county for at least ten years and has attained the age of 55, although the county board of supervisors has the discretion to lower the minimum age of retirement to 50 years. (§ 31672, subd. (a).) Once vested county employees reach the minimum retirement age, they may elect

to retire and begin receiving monthly retirement benefits.[4] (§ 31672, subd. (a).)

CERL contains a series of statutory benefit schedules that may be adopted by a participating county. (§§ 31676.01–31676.19.) These schedules determine the amount of a retiring employee's pension benefit, which is calculated on the basis of the employee's (1) age at retirement, (2) years of service, and (3) final compensation. Final compensation, explained further below, is roughly equivalent to the employee's annual compensation, and it depends directly on "compensation earnable," the statutory term amended by PEPRA. Under one typical schedule, for example, a retiring employee will receive an annual pension benefit equal to one-sixtieth of his or her final compensation for each year of county employment, multiplied by

---

[4] As explained in *Cal Fire*, *supra*, 6 Cal.5th 965, use of the term "vested" is potentially confusing here because the term is used in two different ways in discussing pensions. (*Id.* at p. 972, fn. 3.) County employees become eligible to receive a pension after ten years of county employment. (§ 31672, subd. (a).) Once an employee has become qualified to receive a pension by satisfying this minimum service requirement, he or she is said to be "vested" with respect to the receipt of a pension. That is not the same as having a "vested right" in a particular pension benefit. The term "vested right" has come to refer to a benefit of public employment whose repeal or other divestment is constrained by the constitutional contract clause. (*Cal Fire*, at p. 972, fn. 3.) To further compound the confusion, "vested right" means different things in other legal contexts. (E.g., *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 791 (*Avco*) ["vested right" to pursue a permitted real estate development].)

a number derived from a table in the statute.[5] (§ 31676.1.) That number is determined by the employee's age at retirement and increases gradually with retirement age, reaching a maximum for retirement at age 65. (*Ibid.*) This last calculation leads an employee who retires at a more advanced age to receive a greater pension benefit than a similarly situated employee who retires at a younger age.

As this description demonstrates, a county employee's final compensation is a critical factor in determining the amount of his or her pension benefit, because the benefit is calculated as a percentage of final compensation. All other things being equal, the greater an employee's final compensation, the greater will be the monthly pension benefit.

## B. Compensation Earnable

At issue in this matter is PEPRA's amendment of section 31461, the CERL provision defining the term "compensation earnable." Final compensation, which factors directly into the

---

[5] Pension benefits under CERL are composed of two elements, a "service retirement annuity" and a "current service pension." (§§ 31673-31675; *O'Neal v. Stanislaus County Employees' Retirement Assn.* (2017) 8 Cal.App.5th 1184, 1199.) Our example does not discuss the distinction between these two elements because it appears to make no practical difference in the size of an employee's pension benefit. Under the benefit schedules, the amount of the current service pension is calculated to result in an identical pension benefit for employees with identical circumstances of retirement, without regard to the respective size of their service retirement annuities. (E.g., §§ 31676.01, 31676.1 [current service pension is calculated so that, "when added to the service retirement annuity," the total pension benefit will have a particular value].)

pension benefit calculation, is statutorily defined as an employee's annual compensation earnable, received either in a single specific year or calculated as an average over three specific years.[6]  (§§ 31462, 31462.1; *Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, 499 (*Ventura County*).)  The basis for a county employee's pension benefit is therefore the annual compensation earnable received by the employee in the period during which final compensation is determined.

Compensation earnable, in turn, is defined in section 31461 as the employee's "average compensation . . . for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay.  The computation for any absence shall be based on the compensation of the position held by the member at the beginning of the absence."[7]  (§ 31461, subd. (a).)  For purposes of this definition, "compensation" is statutorily defined as the employee's "remuneration paid in cash . . . but does not include

---

[6]     The three-year average governs unless the county board of supervisors affirmatively elects the single year alternative. (§§ 31462, 31462.1, subd. (a)(2).)  In either case, the retiring employee is entitled to designate the year or years to be used in calculating final compensation.  (§§ 31462, 31462.1.)

[7]     CERL contains a few alternative definitions of compensation earnable applicable in specific circumstances. (See, e.g., §§ 31461.1, 31461.4, 31461.45 [all applicable only to Los Angeles County; see §§ 28020, 28022]; 31461.2 [applicable only to certain administrators and coroners].)  We are concerned here only with the generally applicable definition, which is found in section 31461, subdivision (a).

the monetary value of board, lodging, fuel, laundry, or other advantages furnished to a member." (§ 31460.) Since the 1990s, CERL has provided that an employee's contributions to a deferred compensation plan are included in compensation earnable in the year of the contribution, rather than the year in which the sums are withdrawn from the plan. (§§ 31460, 31461; see *Ventura County*, *supra*, 16 Cal.4th at p. 491.) Further, compensation earnable has long been held not to include overtime pay. (See *Guelfi v. Marin County Employees' Retirement Assn.* (1983) 145 Cal.App.3d 297, 306–307 (*Guelfi*) ["overtime pay is not 'compensation earnable' and thus is not to be included in computing . . . 'final compensation' "].) Since 2000, overtime premium pay has been expressly excluded from compensation earnable in most circumstances by section 31461.6. (Stats. 2000, ch. 966, § 3.)

As our quotation from section 31461 suggests, CERL's definition of compensation earnable is both very general and somewhat inscrutable. (See *Ventura County*, *supra*, 16 Cal.4th at p. 493 [sections 31460 and 31461 are "ambiguous in some respects"].) After an extensive examination of the language and legislative history, we held in *Ventura County* that " 'compensation earnable' is the average pay of the individual retiring employee computed on the basis of the number of hours worked by other employees in the same class and pay rate — that is[,] the average monthly pay, excluding overtime, received by the retiring employee for the average number of days worked in a month by the other employees in the same job classification at the same base pay level." (*Id.* at p. 504.) Accordingly, to calculate compensation earnable, section 31461 uses a retiring employee's personal daily rate of pay, while it looks to the

number of days "ordinarily" worked by comparable employees — that is, "persons in the same grade or class of positions during the period, and at the same [base] rate of pay" (*id.*, subd. (a)) — to determine the number of workdays over which that rate of pay is applied. As a practical matter, a retiring employee's final compensation is the annual compensation the employee would have received had he or she worked the average number of days ordinarily worked by his or her peers during the final compensation period. To find final compensation, a county retirement board is presumably required to determine the employee's compensation during the final compensation period, divide that figure by the days worked by the employee in that time to determine his or her average daily rate of pay, and then multiply that rate by "the average [annual] number of days ordinarily worked" (*ibid.*) by the employee's peers during the final compensation period.[8]

Determining the components of an employee's compensation that are included in compensation earnable has been a recurring issue in the implementation of CERL. The compensation of many county employees, particularly including public safety workers like the members of the Association, consists of a base salary augmented by a series of employee-

---

[8]     This is the manner in which at least one county retirement board does calculate final compensation. (See, e.g., Orange County Employees Retirement System Compensation Earnable Policy (Mar. 18, 2019), at p. 4 [using hours worked rather than days worked] <https://www.ocers.org/sites/main/files/file-attachments/compensationearnablepolicy_1.pdf> [as of July 30, 2020]; all Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.)

specific add-ons to recognize, for example, special training, experience, or hazardous duty. Prior to our decision in *Ventura County*, many county retirement boards were guided by *Guelfi*, *supra*, 145 Cal.App.3d 297, which held that compensation earnable does not include such add-ons unless they are paid to all of an employee's peers. *Guelfi* also held that the value of in-kind advantages provided to an employee is excluded from compensation earnable, even if the employee is paid the cash value of the advantage rather than receiving it in-kind. (*Id*. at pp. 303–304.) *Ventura County* disapproved both of these aspects of *Guelfi*, holding that the statutory definition of "compensation" in section 31460 includes all cash compensation paid to an employee, regardless whether the cash represented the value of an in-kind benefit or constituted premium pay not received by all of the employee's peers. (*Ventura County*, *supra*, 16 Cal.4th at pp. 496–499.) Because such "compensation" is the basis for compensation earnable, these general holdings from *Ventura County* have guided the determination of compensation earnable under CERL since the decision's issuance in 1997.

## C. PEPRA

The Legislature viewed PEPRA as a "comprehensive" reform of California's public pension systems. (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 340 (2011–2012 Reg. Sess.) Aug. 28, 2012, p. 8.) Many of PEPRA's provisions were based on a reform proposal published by Governor Edmund G. Brown, Jr. in October 2011.[9] Its

---

[9] A copy of Governor Brown's "Twelve Point Pension Reform Plan," which is dated October 27, 2011, is posted on the

centerpiece was a new pension plan applicable only to newly hired public employees that is "less expansive, and therefore less burdensome for the state and local governments, than the plans covering then-existing public employees." (*Cal Fire, supra,* 6 Cal.5th at pp. 974–975.) But PEPRA also modified some statutes governing the pensions of existing employees (*Cal Fire,* at p. 975) and incorporated provisions from separately pending legislation that were not a part of the governor's proposal. One of those provisions was the amendment at issue in this matter.[10]

---

California government website at <https://www.ca.gov/archive/gov39/wp-content/uploads/2017/09/Twelve_Point_Pension_Reform_10.27.11.pdf> [as of July 30, 2020].

[10] As explained in a contemporary Senate bill analysis, "The comprehensive pension reform proposal . . . is based on the Governor's 12-Point Pension Reform Plan. [¶] The Conference Committee Report includes 10 of the 12 points included in the Governor's plan. . . . Additionally, in order to achieve the goal of comprehensive reform, included are some pension reform changes found in bills going through the Legislature this session that were not included as part of the Governor's plan." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 340 (2011-2012 Reg. Sess.) Aug. 28, 2012, pp. 7-8.) Rather than arising in the governor's reform proposal, however, the provision of PEPRA under consideration here originated in an earlier version of Assembly Bill 340 and was retained throughout the legislative process. (Assem. Bill No. 340, Final Hist. (2011-2012 Reg. Sess.); see Assem. Bill No. 340, as amended April 25, 2011; Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 340 (2011-2012 Reg. Sess.) Aug. 28, 2012.)

The present amendment, applicable to the pensions of both legacy and new employees, added a subdivision to the definition of compensation earnable in section 31461.[11] (Stats.

---

[11] In the text, we often refer to this provision of PEPRA as "the PEPRA amendment."

Subdivision (b) of section 31461, added by the PEPRA amendment, provides:

"(b) 'Compensation earnable' does not include, in any case, the following:

"(1) Any compensation determined by the board to have been paid to enhance a member's retirement benefit under that system. That compensation may include:

"(A) Compensation that had previously been provided in kind to the member by the employer or paid directly by the employer to a third party other than the retirement system for the benefit of the member, and which was converted to and received by the member in the form of a cash payment in the final average salary period.

"(B) Any one-time or ad hoc payment made to a member, but not to all similarly situated members in the member's grade or class.

"(C) Any payment that is made solely due to the termination of the member's employment, but is received by the member while employed, except those payments that do not exceed what is earned and payable in each 12-month period during the final average salary period regardless of when reported or paid.

"(2) Payments for unused vacation, annual leave, personal leave, sick leave, or compensatory time off, however denominated, whether paid in a lump sum or otherwise, in an amount that exceeds that which may be earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid.

2012, ch. 296, § 28.) New subdivision (b) excludes entirely from compensation earnable two types of compensation and limits the amount of two other types of compensation that can be included in any 12-month period during the final compensation period. (§ 31461, subd. (b).) As a result of the amendment, compensation earnable now excludes any compensation determined by the local retirement board to have been paid to enhance a member's retirement benefit (*id.*, subd. (b)(1)) and any compensation for services rendered outside normal working hours (*id.*, subd. (b)(3)). In addition, compensation for the surrender of unused paid time off, such as vacation and sick leave, and payments made at termination of employment, which often also constitute compensation for unused leave time, can be included in compensation earnable only to the extent the leave time was "earned and payable" in any 12-month period during a final compensation year.[12] (§ 31461, subd. (b)(2) & (b)(4).) Soon after PEPRA was adopted, related legislation added subdivision (c) to section 31461, which clarifies that the "terms of subdivision (b) are intended to be consistent with . . . the holdings in *Salus v. San Diego County Employees Retirement*

---

"(3) Payments for additional services rendered outside of normal working hours, whether paid in a lump sum or otherwise.

"(4) Payments made at the termination of employment, except those payments that do not exceed what is earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid."

[12] The words "and payable" were added to section 31461, subdivision (b)(2) by a separate bill passed soon after PEPRA. The same bill added subdivision (c) to section 31461. (Stats. 2012, ch. 297, § 2.)

*Association* (2004) 117 Cal.App.4th 734 and *In re Retirement Cases* (2003) 110 Cal.App.4th 426." (Stats. 2012, ch. 297, § 2.)

A bill analysis prepared in connection with the pre-PEPRA version of Assembly Bill 340 explained that the purpose of these changes was to circumscribe CERL's "very broad and general definition of 'compensation earnable' " in order to reduce pension " 'spik[ing],' " the manipulation of an employee's pattern of work and pay to produce inflated compensation earnable during the final compensation period. (Assem. Comm. on Public Employees, Retirement and Social Security, Analysis of Assem. Bill No. 340 (2011–2012 Reg. Sess.) Apr. 25, 2011, p. 3.)

A review of the exclusions and limitations in PEPRA's amendment of section 31461 demonstrates that the Legislature sought to limit pension spiking by eliminating practices that, while arguably permitted under the broad language of the preexisting definition, are inconsistent with the statute's overall concept of compensation earnable. Subdivision (b)(1) excludes compensation found by a retirement board to have been "paid to enhance a member's retirement benefit." In a properly operating employment setting, compensation received by employees is paid to compensate for their work; its enhancement of an employee's pension benefit is merely a consequence, not an objective, of the compensation. In excluding compensation found by the retirement board to have been paid to enhance a pension benefit, the Legislature appears to have been concerned that some employees, presumably those in positions of unusual authority or influence, were able to manipulate county compensation practices to artificially increase their cash compensation during the final compensation period. Subdivision (b)(1) provides three examples of the types of

compensation that could raise an inference of improper payment.[13] Each contemplates a departure from ordinary practices: cash compensation in lieu of a benefit normally provided in-kind (§ 31461, subd. (b)(1)(A)), which would bring the value of an otherwise excluded in-kind benefit within the definition of compensation; a "one-time or ad hoc payment made to a member" but not to peers (*id.*, subd. (b)(1)(B)); and a payment made "solely due to the termination of the member's employment" but received while the employee is still employed (*id.*, subd. (b)(1)(C)). Because payments made upon or after termination of employment have been held to be outside compensation earnable (see *In re Retirement Cases* (2003) 110 Cal.App.4th 426, 473–476 (*Retirement Cases*)), this would also make pensionable a form of compensation otherwise excluded from compensation earnable.

New subdivision (b)(3) of section 31461 excludes payments for "additional services rendered outside of normal working hours" from compensation earnable. An often-cited example of such compensation is on-call duty pay, which is provided to

---

[13] The PEPRA amendment does not require exclusion solely because an item of compensation fits within one of these examples. Instead, they illustrate the type of practices that raise suspicion under section 31461, subdivision (b)(1). (*Ibid.* ["That compensation may include. . . ."].) Before it is excluded, an item of compensation described by subdivision (b)(1)(A) through (C) must be found by the county retirement board to have been "paid to enhance a member's retirement benefit." (§ 31461, subd. (b)(1).) Section 31542, subdivision (a), also added by PEPRA (Stats. 2012, ch. 296, § 29), requires each board to "establish a procedure for . . . determining whether an element of compensation was paid to enhance a member's retirement benefit."

employees in return for voluntarily making themselves available to be called to work outside their normal working hours. Because such pay is cash remuneration, it is "compensation" under section 31460. Yet because compensation earnable excludes overtime pay and is calculated on the basis of the days "ordinarily" worked by an employee's peers (§ 31461, subd. (a)), the inclusion of payment for services provided outside normal hours in compensation earnable is arguably inconsistent with the statutory concept.

As to new subdivision (b)(2) of section 31461, many counties permit employees to accumulate unused leave time, such as vacation days and sick leave, and to "cash out" the leave time at a later date by receiving the cash value of the time in return for its surrender. Such leave time is earned in the year in which it is awarded. Yet compensation for cashed out leave time becomes "compensation" for purposes of section 31460 in the year in which the cash value is received, which need not be the year in which the surrendered time was earned. This can lead to a distortion of the pension calculation when leave time awarded in a prior year is cashed out during the final compensation period, since this has the effect of adding remuneration for a prior year's service to the compensation received for service during the final compensation period. A similar problem arises with payments made upon termination of employment, excluded by section 31461, subdivision (b)(4), because such payments are generally also compensation for the surrender of accrued leave time. By limiting the amount of "cash out" and termination pay that can be included in compensation earnable to the value of leave time "earned and payable in each 12-month period during the final average salary

period" (*ibid*.), the Legislature appears to have intended to prevent retiring employees from, in effect, including remuneration earned during prior years in the final compensation calculation.

The State points to an additional function of section 31461, subdivision (b)(2) and (4). Prior to PEPRA's amendment, even in counties that limited the amount of leave time that could be cashed out in a calendar year, employees were able to double the amount of cashed out leave time received during a final compensation year by designating a final compensation year that straddles two calendar years, for example, July 1 through June 30. By cashing out leave time in the second half of the prior calendar year and the first half of the subsequent calendar year, a retiring employee could double the amount of cashed out leave time received in the final compensation year. By limiting the inclusion of cashed out leave time to that "earned and payable" in a "12-month period," subdivision (b)(2) and (4) prevent this practice.

We emphasize that there is nothing inherently abusive in the practices addressed by section 31461, subdivision (b)(2) through (4), at least when divorced from their pension consequences. Accepting voluntary on-call duty and cashing out unused leave time to the extent permitted by an employer are ordinary practices that serve proper public policy interests. Yet by not expressly excluding such payments when determining a county employee's pension benefit, the pre-PEPRA definition of compensation earnable allowed an employee to considerably increase his or her pension benefit by volunteering for a large quantity of on-call duty or by accumulating and cashing out a large quantity of unused leave time during the final

compensation period. Because such enhancements are arguably inconsistent with the underlying concept of compensation earnable, which is intended to reflect pay for work ordinarily performed during the course of a year, these types of enhancement have been characterized as pension spiking.

## D. This Litigation

Following the enactment of PEPRA, the Association, the Merced County Sheriff's Employees' Association, and the Contra Costa County Deputy Sheriffs Association filed separate petitions for a writ of mandate against their respective county retirement boards.[14] The three matters were eventually consolidated in a single proceeding in Alameda County.[15] The fundamental contention of these lawsuits was that PEPRA's exclusion of certain types of income from compensation earnable could not lawfully be applied to the calculation of the pensions of persons who were county employees at the time PEPRA became effective.

---

[14] Various other entities and individual plaintiffs also joined as petitioners in these actions. In the course of the proceedings, additional parties were permitted to intervene or were joined as defendants, including the State, several public employers, such as the counties and county agencies like the District, and other public employee organizations.

[15] A fourth, similar case from Marin County was ordered consolidated with these three, but that case was dismissed on demurrer prior to enforcement of the order of consolidation. The judgment in that action was affirmed in *Marin Assn. of Public Employees v. Marin County Employees' Retirement Assn.* (2016) 2 Cal.App.5th 674 (*Marin County*). We granted review of *Marin County* (Nov. 22, 2016, S237460) but have deferred briefing.

The litigation revealed that PEPRA's amendment of section 31461 had caused the three county retirement boards to change certain policies governing the calculation of compensation earnable. Although the exact pre-PEPRA practices varied among these counties, each retirement board maintained a policy permitting employees to include in compensation earnable at least some of the types of compensation that are excluded or limited by the PEPRA amendment. Most often this was compensation for cashed out leave time, which could be included in an amount exceeding that earned and payable in a single year, but on-call duty pay and some termination pay were also includable in one or more of the counties. (See *Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2018) 19 Cal.App.5th 61, 82–83 (*Alameda Sheriffs*).)

Further, the changes required by PEPRA were, in some cases, contrary to the terms of agreements entered into between the county retirement boards and county employees, as well as written policies adopted to reflect the terms of those agreements. This court's decision in *Ventura County*, *supra*, 16 Cal.4th 483, by disapproving much of *Guelfi*, *supra*, 145 Cal.App.3d 297, called into question aspects of the then-prevailing approach to the calculation of compensation earnable under CERL. In the wake of *Ventura County*, county employees and their representatives filed lawsuits against many CERL retirement boards, including those in Alameda, Contra Costa, and Merced Counties, to address these issues. Each of these three lawsuits was resolved by a settlement agreement that, in part, required the respective retirement boards to include various types of compensation in the calculation of

compensation earnable. Because these agreements were still in effect when PEPRA was enacted, compliance with its amendment of section 31461 led the boards to adopt policies that were, to some extent, inconsistent with the terms of the settlement agreements. (*Alameda Sheriffs, supra,* 19 Cal.App.5th at pp. 85–86.)

The plaintiffs in the consolidated actions contended that county employees had both a vested right under the constitutional contract clause to the continued application of the policies in effect prior to PEPRA and, separately, a right under the settlement agreements, either directly or pursuant to the doctrine of equitable estoppel, to the continued application of the policies contained in them.[16] After extensive litigation, the trial court entered a writ of mandate, ruling that county employees possess a vested right to the continuation of some, but not all, of the pre-existing practices.

The Court of Appeal affirmed in part and reversed in part in *Alameda Sheriffs, supra,* 19 Cal.App.5th 61. The court concluded that subdivision (b)(1) and (3), added to section 31461

---

[16]    In their complaint, the plaintiffs cited the contract clauses of both the state and federal Constitutions as authority for their constitutional claims. In *Cal Fire*, we implicitly considered only California's contract clause. (Cal. Const., art. I, § 9; *Cal Fire, supra,* 6 Cal.5th at pp. 976, 977 & fn. 8 [plaintiffs' claims pleaded under the California Constitution].) We take the same approach here, ruling solely on California's unique approach to the contract clause in this context and discussing decisions under the United States Constitution only for their persuasive value in interpreting our own. Plaintiffs do not suggest that the federal Constitution provides greater protection for their pension rights than does the California Constitution.

by PEPRA, changed the law governing CERL pensions by excluding types of compensation that were previously included in compensation earnable. (*Alameda Sheriffs*, at pp. 109–112.) Although recognizing that the constitutionality of these changes is governed by the *Allen I* test, the court declined to resolve the constitutional issue, concluding that it was "without sufficient information" about the implementation of CERL in the three counties. (*Alameda Sheriffs*, at p. 123.) At the same time, the court accepted the plaintiffs' estoppel argument, ruling that the injustice resulting from a failure to give effect to the terms of the settlement agreements outweighed " 'any effect upon public interest or policy' " from failing to give effect to the terms of PEPRA. (*Alameda Sheriffs*, at p. 126.)

We granted petitions for review filed by (1) the Association and the individual plaintiffs in its action, (2) the District, which had been joined as a defendant in the Contra Costa County action because it employs persons who participate in a CERL pension plan, and (3) the State, which had been permitted to intervene in the consolidated actions to defend the constitutionality of the legislation.

## II. DISCUSSION

The issues raised here fall into two groups: first, whether the provisions of PEPRA's amendment of CERL violated rights acquired by county employees by virtue of the settlement agreements entered into with the retirement boards, and, second, whether the amendment impaired county employees' constitutionally protected implied contractual rights in the implementation of CERL as it existed prior to the PEPRA amendment. Pursuant to traditional jurisprudential principles, we turn first to the nonconstitutional questions raised by the

settlement agreements. (See *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230–231 [the court will not decide constitutional questions when other dispositive grounds are available].)

## A. The Retirement Boards' Settlement Agreements Did Not Create a Contractual or Equitable Right to the Calculation of Pension Benefits That Supersedes the PEPRA Amendment

Plaintiffs contend that county employees have the right to continue, after PEPRA, to have included in compensation earnable the items of compensation declared includable by the settlement agreements entered into by the retirement boards in the wake of *Ventura County*, despite the exclusion or limitation of these items by new subdivision (b)(2) through (4) of section 31461.[17] Plaintiffs contend that this right arises either directly, under the terms of the agreements, or by operation of the doctrine of equitable estoppel. We conclude that neither argument authorizes the county retirement boards to administer CERL in a manner inconsistent with the governing statutory provisions by including items of compensation in compensation earnable that section 31461, as amended, excludes.

---

[17] The precise nature of the compensation at issue varies among the settlement agreements, which are not identical in their terms, but each agreement states that employees will be allowed to include in compensation earnable at least some of the types of compensation ruled out by PEPRA's amendment of section 31461.

26

>    *1.  Local retirement boards are required to comply
>         with CERL in calculating county employee pension
>         benefits*

An understanding of the proper role of county retirement boards under CERL is critical to resolving plaintiffs' contract and estoppel claims.  Under CERL, "management of the retirement system is vested" in the county retirement boards. (§ 31520.)  This delegation of authority is echoed by article XVI of our Constitution, which grants to public employee retirement boards, including those operating under CERL, the "sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries."  (Cal. Const., art. XVI, §17, subd. (a); see *Flethez v. San Bernardino County Employees Retirement Assn.* (2017) 2 Cal.5th 630, 635–636 [applying art. XVI to a county retirement system].)  As a practical matter, the retirement boards' responsibilities generally involve management of the system's financial assets (*Westly v. Board of Administration* (2003) 105 Cal.App.4th 1095, 1109–1110 (*Westly*)) and the processing and payment of claims for benefits under the plan (see, e.g., *McIntyre v. Santa Barbara County Employees' Retirement System* (2001) 91 Cal.App.4th 730, 734 [board has exclusive authority to determine whether plan is obligated to pay benefits to employee]; *Masters v. San Bernardino County Employees Retirement Assn* (1995) 32 Cal.App.4th 30, 45 [board has exclusive authority to determine whether employee is permanently incapacitated and whether the disability is service-related]).  In carrying out these responsibilities, the Constitution grants retirement boards "plenary authority and fiduciary responsibility for investment of moneys and administration of the system."  (Cal. Const., art.

XVI, §17.) Of necessity, the task of processing claims for retirement benefits requires the county retirement boards to interpret and apply the provisions of CERL, including the sections defining compensation, compensation earnable, and final compensation.

The task of a county retirement board is not to design the county's pension plan but to implement the design enacted by the Legislature through CERL. As noted, CERL speaks of the retirement boards as "manag[ing]" the retirement system (§ 31520), while the Constitution charges them with "administer[ing]" the system and its assets (Cal. Const., art. XVI, §17, subd. (a)). Although CERL grants to retirement boards the power to make regulations, those regulations must be consistent with the provisions of CERL. (§ 31525 ["The board may make regulations not inconsistent with this chapter"].) The boards do not have the authority to "evade the law" that otherwise applies to their system. (*Westly*, *supra*, 105 Cal.App.4th at p. 1100.) "The granting of retirement benefits is a legislative action within the exclusive jurisdiction of the [relevant legislative body]. . . . [¶] It is not within [a board's] authority to expand pension benefits beyond those afforded by the authorizing legislation. . . . The scope of the board's power as to benefits is limited to administering the benefits set by the [legislative body]." (*City of San Diego v. San Diego City Employees' Retirement System* (2010) 186 Cal.App.4th 69, 79–80; see similarly *City of San Diego v. Haas* (2012) 207 Cal.App.4th 472, 495.) This conclusion follows from principles governing the authority of administrative bodies generally: "[I]t is well established that the rulemaking power of an administrative agency does not permit the agency to exceed

the scope of authority conferred on the agency by the Legislature. [Citation.] 'A ministerial officer may not . . . under the guise of a rule or regulation vary or enlarge the terms of a legislative enactment or compel that to be done which lies without the scope of the statute . . . .' [Citation.] And, a regulation which impairs the scope of a statute must be declared void." (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 321; see *PaintCare v. Mortensen* (2015) 233 Cal.App.4th 1292, 1305–1306 ["An administrative agency 'has only as much rulemaking power as is invested in it by statute.' [Citations.] Regulations that are inconsistent with a statute, alter or amend it, or enlarge or impair its scope are void"].)

Accordingly, it is the Legislature that has final authority to establish the provisions governing the award of pension benefits under CERL. Further, it is the judiciary, not individual retirement boards, that has "final responsibility" for the interpretation of the Legislature's terms. (*Terhume v. Superior Court* (1998) 65 Cal.App.4th 864, 873.) For that reason, although county retirement boards have the authority to interpret CERL's provisions as necessary to perform their administrative functions, they have no authority to adopt or act on an interpretation that is inconsistent with those provisions. An administrative action that is unauthorized or inconsistent with governing legislation is invalid. (*Terhume*, at p. 873.)

> 2. *County retirement boards cannot confer a contractual right to the calculation of employee pension benefits in a manner inconsistent with CERL*

Plaintiffs argue that, by virtue of the settlement agreements, existing county employees have an express

29

contractual right to the continued inclusion in compensation earnable of certain items otherwise excluded by PEPRA's amendments. In order to find such a right, the settlement agreements must be interpreted to require that their classifications of compensation be applied in calculating the pensions of existing employees, regardless of subsequent statutory amendments or judicial decisions. The settlement agreements are silent on this issue. None of them contains a provision anticipating the possibility that CERL's definition of "compensation earnable" could be legislatively amended in a manner inconsistent with their classifications or addressing the fate of those classifications in the event of legislative change or contrary judicial decision.

It is a commonplace that "[a] contract must be lawful [citation], i.e., it must not be in conflict either with express statutes or public policy." (*Vierra v. Workers' Comp. Appeals Bd.* (2007) 154 Cal.App.4th 1142, 1148; see Civ. Code, § 1550.) California decisions have repeatedly recognized that this principle places constraints on the authority of public agencies to enter into agreements, since those agreements are unlawful if they exceed the agencies' procedural and substantive powers. Procedurally, an agreement cannot be used to avoid legally prescribed procedures by dictating a result that, although within an agency's power, can be achieved only by following those procedures. (E.g., *City of San Diego v. California Water & Telephone Co.* (1947) 30 Cal.2d 817, 823–824 [city agreement to abandon road held void because the statutory procedure for abandonment, requiring public hearings, is exclusive]; *Trancas Property Owners Assn. v. City of Malibu* (2006) 138 Cal.App.4th 172, 181–183 [city cannot, in litigation settlement agreement,

avoid the requirement of a public hearing and findings by agreeing to the functional equivalent of a zoning variance].) Substantively, an agency cannot agree to a result that is otherwise beyond its power to achieve. (E.g., *Summit Media LLC v. City of Los Angeles* (2012) 211 Cal.App.4th 921, 936–937 [city cannot agree to exempt party from otherwise applicable ordinances]; *Midway Orchards v. County of Butte* (1990) 220 Cal.App.3d 765, 783 [city cannot by agreement approve a real estate development that is inconsistent with its general plan].) As a corollary of this principle, a public agency is prohibited from entering into an agreement that constrains the future exercise of its legislative or police powers. (*Avco, supra,* 17 Cal.3d at p. 800; *Summit Media,* at p. 934–935.)

As discussed above, the duty of a county retirement board is to administer CERL as enacted by the Legislature; the boards have no authority to act inconsistently with CERL. Accordingly, the county boards must comply with any changes to CERL enacted by the Legislature. They have no authority to disregard such amendments by continuing to pursue a practice that is contrary to CERL. As a consequence, any provision in the settlement agreements that would have required the retirement boards to continue to apply the agreed upon characterizations in the face of contrary legislative changes or authoritative judicial interpretations would have been void. The retirement boards had no authority to enter into an agreement that would require them to pursue a policy that conflicts with the governing legislation.

Accordingly, the settlement agreements are best interpreted to require the retirement boards to implement their classifications of items of compensation only so long as those

classifications are consistent with prevailing law. (See Civ. Code, § 1643 ["A contract must receive such an interpretation as will make it lawful"]; *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 953–954 [same]; *Tiedje v. Aluminum Taper Milling Co.* (1956) 46 Cal.2d 450, 453–454 ["A contract made . . . against the express mandate of a statute may not serve as the foundation of any action, either in law or in equity"].) To the extent any of the provisions of the settlement agreements are now in conflict with section 31461, the agreements must be interpreted to permit the retirement boards to modify their practices to conform to the governing statute. County employees acquired no express contractual right to have their retirement benefits calculated in a manner inconsistent with changes in CERL.

Plaintiffs argue that the settlement agreements did not exceed the retirement boards' power because the interpretations of CERL embodied in the settlement agreements were permissible under section 31461 as it existed at the time the agreements were executed. This argument is based, at least in part, on footnote 6 of *Guelfi*, *supra*, 145 Cal.App.3d at page 307. In this controversial footnote, the court interpreted section 31461 merely to establish a minimum standard for the items that must be included in compensation earnable, while leaving individual retirement boards the discretion to include other items of compensation beyond this minimum. As *Guelfi* phrased it, "[n]othing in this opinion should be taken as barring either the inclusion of [pay premiums or] overtime in the calculation of benefits should the Board decide to do so . . . . Our conclusion is only that CERL does not *require* inclusion of those items of

remuneration for retirees." (*Guelfi*, at p. 307, fn. 6, italics added.)

Like the Court of Appeal, we reject this open-ended concept of compensation earnable, and we hereby disapprove of footnote 6 of *Guelfi v. Marin County Employees' Retirement Assn.*, *supra*, 145 Cal.App.3d at page 307. As the Court of Appeal correctly explained, compensation earnable under section 31461 has a specific statutory definition: It is an employee's "average compensation . . . for the period under consideration," adjusted for "the average number of days ordinarily worked by persons in the same grade or class of positions during the period. . . . " (§ 31461, subd. (a); see *Alameda Sheriffs*, *supra*, 19 Cal.App.5th at pp. 94–95.) The term "compensation," as used in section 31461, is similarly statutorily defined: It is an employee's "remuneration paid in cash" and expressly excludes the "monetary value" of benefits paid in kind. (§ 31460.) Nothing in those definitions hints either that they are intended merely to establish a minimum, rather than to serve as a comprehensive definition, or that they may be implemented at the discretion of local retirement boards. There is no indication, for example, that a local board has the discretion to include the monetary value of in-kind benefits, which are expressly excluded by section 31461. Necessarily, the same is true of any other item of compensation that, even if not expressly mentioned as excluded, does not fall within the definitions. County retirement boards, as discussed above, have the ordinary authority of an administrative body to resolve, in the first instance, ambiguities in the interpretation and application of these statutes, but nothing in the text of sections 31460 and 31461 hints that the discretion extends further. As

the Court of Appeal pithily put it, "[a]n item of compensation is either includable in compensation, compensation earnable, and final compensation under the CERL statutes, or it is not." (*Alameda Sheriffs*, at p. 96.)

In any event, plaintiffs' contention — that the determination of compensation earnable in the settlement agreements should be honored because they reflect interpretations that were lawful at the time — misses the point. We assume for purposes of this analysis that the settlement agreements embodied permissible interpretations of CERL at the time they were executed. The issue here is whether the retirement boards could have agreed to *continue* to implement those interpretations despite a statutory amendment that rendered the interpretations contrary to CERL. For the reasons discussed above, such a provision would have been beyond their authority. County employees can have no express contractual right to the continued adherence to interpretations of CERL that are now, as a result of PEPRA, contrary to the statute.[18]

---

[18] Plaintiffs also argue that county employees acquired a contractual right to receive these benefits because their contributions to the county pension fund were based on an actuarial calculation that included the additional benefit costs attributable to the inclusion of items now excluded or limited by PEPRA. In plaintiffs' view, county employees have, in effect, paid for the inclusion of the items excluded by PEPRA but permitted by the settlement agreements. Although this might entitle employees to a partial refund of their contributions, an issue we do not address, it does not create a contractual right to receive benefits in a manner inconsistent with CERL. (Cf. *Retirement Cases, supra,* 110 Cal.App.4th at pp. 453-454, 469-472 [county employees have a right only to receive a pension

Finally, we note that plaintiffs repeatedly refer to the settlement agreements as judicially approved. Judicial approval of the agreements does not alter our conclusion that they must be interpreted not to confer on the retirement boards the authority to pursue policies contrary to CERL. As noted above, our analysis assumes that the interpretations of CERL embodied in the settlement agreements were proper at the time they were approved. At most, the courts' approval confirms this. The approving courts, however, rendered no opinion on the continued validity of those interpretations in the face of subsequent legislative amendments. Even if judicial approval of a settlement agreement could have conferred upon retirement boards the authority to violate a future amendment of CERL, a very doubtful proposition, there is no reason to conclude that these approvals should be understood as conferring such authority.

Our ruling does not mean that county employees could not have acquired a *constitutional* right to the continued calculation of their pension benefits in the manner existing prior to PEPRA, a right that would be enforceable against subsequent, inconsistent amendments to CERL. In these circumstances, however, such a right could be created only by the preamendment provisions of *CERL,* as enforced by the constitutional contract clause — that is, created in the manner discussed in part II.B, *post.* Because the settlement agreements are properly interpreted not to require the boards to adhere to

benefit as mandated by CERL, regardless of contributions; county retirement boards can collect contributions in arrears to compensate for increased pension benefits resulting from *Ventura County*'s interpretation of CERL].)

contractual terms that become contrary to the governing statute, plaintiffs have no express contractual right to receive benefits calculated in a manner that is inconsistent with the PEPRA amendment.

> ### 3. *Plaintiffs have failed to demonstrate the prerequisites for invocation of the doctrine of equitable estoppel*

The Court of Appeal held that the Merced County retirement board is precluded from implementing new subdivision (b)(4) of section 31461, which limits the inclusion of termination pay in compensation earnable, by the doctrine of equitable estoppel. The estoppel was premised on the settlement agreement entered into by that board following the issuance of *Ventura County*. (*Alameda Sheriffs*, *supra*, 19 Cal.App.5th at pp. 125–126.) Although the Court of Appeal invoked the doctrine only in connection with the Merced County agreement, its reasoning would extend more generally to any inconsistency between the settlement agreements and the terms of section 31461 and require the boards to adhere to the interpretation of CERL found in the settlement agreements, notwithstanding the changes introduced by the PEPRA amendment.[19] Plaintiffs urge us to affirm the Court of Appeal

---

[19]   The ruling applied only to the Merced County retirement board because only its settlement agreement permitted the inclusion of termination pay. Because the Court of Appeal had already interpreted the PEPRA amendment not to limit the inclusion of compensation for cashed out leave time, the court found it unnecessary to consider application of the doctrine of estoppel to that type of compensation. (*Alameda Sheriffs*, *supra*, 19 Cal.App.5th at p. 124.)

on this ground and extend our ruling to any inconsistency between the settlement agreements and PEPRA.

" 'The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*City of Goleta v. Superior Court* (2006) 40 Cal.4th 270, 279 (*Goleta*).) Although equitable estoppel is a well-accepted remedy among private parties, it has been applied sparingly when the party sought to be estopped is a governmental entity. "The government may be bound by an equitable estoppel in the same manner as a private party" (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 496–497, 501 (*Mansell*)), but the doctrine is invoked only in "those 'exceptional cases' where 'justice and right require' " (*id.* at p. 501) — that is, when "the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel" (*id.* at pp. 496–497). In short, "[e]quitable estoppel 'will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy.' " (*Goleta*, at p. 279.)

We reject the Court of Appeal's conclusion with respect to equitable estoppel because we find no actionable

37

representations in the settlement agreements that would support invocation of that doctrine. Equitable estoppel generally must be premised on some type of representation, ordinarily false, about a set of circumstances. (*J.M. v. Huntington Beach Union High School Dist.* (2017) 2 Cal.5th 648, 657 (*J.M.*) ["Equitable estoppel generally requires an *affirmative* representation or act by the public entity"]; *Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 584 ["A valid claim for equitable estoppel requires . . . a representation or concealment of material facts"].) The representations cited by the Court of Appeal were "the promise that [county employees] would receive a pension as authorized by CERL," combined with "precise and explicit promises to [county employees] as to what such a statutorily authorized CERL pension would include," which promises were found in "their court-approved Post-*Ventura* Settlement Agreements." (*Alameda Sheriffs*, *supra*, 19 Cal.App.5th at p. 128.) The cited representations are insufficient to support an estoppel in these circumstances.

The core of plaintiffs' estoppel claim is the second group of statements cited by the Court of Appeal, the boards' representations about the requirements of CERL, as contained in the settlement agreements.[20] Necessarily, to the extent the

---

[20] The first of these representations, that county employees would receive "a pension as authorized by CERL," is plainly insufficient. Plaintiffs, in seeking an estoppel, are attempting to compel the county boards to award pension benefits in a manner *inconsistent* with CERL. It is defendants who advocate for application of the statute's provisions. Ordinarily, a party will be estopped from "deny[ing] the existence of a state of facts . . . he intentionally led another to believe." (*Goleta*, *supra*,

settlement agreements represent an interpretation of the statutory provisions of CERL, they reflect the statute as it existed at the time the settlement agreements were concluded, a decade prior to PEPRA. The settlement agreements contain no representations that can be construed as a guarantee that these provisions would not be amended. On the contrary, as discussed above, the agreements contain no provisions addressing the agreements' implementation in the event of such an amendment. Further, all parties were presumably aware that CERL's provisions, as enactments of the Legislature, could be changed by that same body, in which event the agreements' interpretations might no longer reflect the statute's provisions. An agency's representation about the contents of its governing statute at a particular point in time, standing alone, provides no basis for estopping the agency from conforming its practice to a statutory change that occurred subsequent to that representation.

Application of the doctrine of estoppel requires, at a minimum, an actionable statement — that is, "an affirmative representation or act by the public entity" that is intended to induce reliance by the plaintiff. (*J.M.*, *supra*, 2 Cal.5th at p. 657, italics omitted.) An actionable representation in these circumstances would require, at a minimum, a statement indicating that the county boards would adhere to the interpretation of CERL found in the settlement agreements *notwithstanding any change in the governing statute*. In the

40 Cal.4th at p. 279.) We know of no authority for estopping a party from denying the very *opposite* of its purportedly actionable representation.

absence of such a representation, county employees had no reason to expect that the county boards would not conform their practice to any changes in their governing statute. The plaintiffs provided no evidence of such a statement. Instead, the county boards merely entered into agreements that embodied an interpretation of CERL as it existed at the time. They subsequently made statements suggesting that employee pensions in their county would be determined according to that interpretation. There is no indication that the boards went further, assuring employees that these interpretations were impervious to legislative change or, more pertinent, that the boards intended to adhere to the interpretations in the face of legislative change. In the absence of this type of representation, we find no basis for estopping the county boards from adjusting their policies in response to the PEPRA amendment, as they are required by law to do.[21]

### B. PEPRA's Amendment of Section 31461 Did Not Violate the Rights of County Employees Under the Constitutional Contract Clause

The terms of public employee pensions are protected by the constitutional contract clause. (*Cal Fire*, *supra*, 6 Cal.5th at

---

[21] In reaching this conclusion, we do not mean to suggest that if such a representation had been made, this would, standing alone, justify imposing an estoppel on the county boards. There are, at a minimum, the further considerations of the board's lack of legal authority to follow through on such a representation and the application of the overriding test for estoppel of a public agency, articulated in *Mansell*, *supra*, 3 Cal.3d at pages 496-497, 501. We merely hold that plaintiffs have failed to demonstrate an actionable representation, the threshold requirement for invocation of the doctrine of equitable estoppel. (*J.M.*, *supra*, 2 Cal.5th at p. 657.)

p. 987; *Legislature v. Eu* (1991) 54 Cal.3d 492, 528 (*Eu*).) At issue here is whether PEPRA's amendment of section 31461 to exclude certain types of compensation from compensation earnable constitutes a substantial and unjustified impairment of county employees' pension rights, the general standard required for a violation of the contract clause in these circumstances. (*Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 308–309 (*Sonoma Employees*).) This is a question of law subject to our independent review. (*Allen I*, *supra*, 45 Cal.2d at p. 131.)

### 1. *Protection of public employee pensions under the contract clause*

#### a. *Contract clause protections generally*

The vested rights doctrine, the foundation of plaintiffs' contention that PEPRA's amendment of section 31461 is unconstitutional as applied to existing county employees, is grounded in the contract clause. (Cal. Const., art. I, § 9.) "Both the United States and California Constitutions contain provisions that prohibit the enactment of laws effecting a 'substantial impairment' of contracts, including contracts of employment." (*Cal Fire*, *supra*, 6 Cal.5th at p. 977.) This constraint applies to public contracts, as well as those between private parties. (*Ibid.*) As suggested by the reference to a *substantial* impairment, not every legislative impairment of contractual relations triggers the contract clause. (*San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 583–584; *Eu*, *supra*, 54 Cal.3d at p. 528 [contract clause protects against "unreasonable" impairments].) "[T]he prohibition is not an absolute one and is not to be read with

literal exactness like a mathematical formula." (*Home B. & L. Ass. v. Blaisdell* (1933) 290 U.S. 398, 428 (*Blaisdell*).)

In evaluating legislation that impairs private contractual rights, the United States Supreme Court applies what it characterizes as a "two-step test." (*Sveen v. Melin* (2018) ___ U.S. ___, ___ [138 S.Ct. 1815, 1821].) As a threshold question, the court must determine " 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. [Citations.] The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected.' " (*Energy Reserves Group v. Kansas Power & Light* (1983) 459 U.S. 400, 411 (*Kansas Power*).) In making this determination, "the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." (*Sveen*, at p. ___ [138 S.Ct. at p. 1822.) If the state law is found to create a "substantial" impairment, "the inquiry turns to the means and ends of the legislation." (*Ibid.*) To justify the legislation, the state "must have a significant and legitimate public purpose behind the regulation, [citation], such as the remedying of a broad and general social or economic problem. . . . The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." (*Kansas Power*, at pp. 411–412.) If the legislation survives that scrutiny, "the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " (*Id.* at p. 412.)

A different, more searching analysis occurs when the state legislates an impairment of its *own* contractual obligations because "the government's self-interest is at stake." (*Sonoma Employees*, *supra*, 23 Cal.3d at p. 308.) Although " 'courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure' " when "the State itself" is not "a contracting party" (*Kansas Power*, *supra*, 459 U.S. at pp. 413, 412), "complete deference to a legislative assessment of reasonableness and necessity is not required" when the state seeks to alter its own obligations. (*Sonoma Employees*, at p. 308.) In general terms, a state's impairment of its own obligations "may be constitutional if it is reasonable and necessary to serve an important public purpose." (*United States Trust Co. v. New Jersey* (1977) 431 U.S. 1, 25 (*U.S. Trust*).)

*Sonoma Employees* addressed a contract clause challenge to state legislation that nullified every agreement between a local government and its employees providing for an annual cost of living wage increase greater than the cost of living increase given by the state to its own employees. The legislation had been passed in the wake of the electorate's adoption of Proposition 13 in 1978, which the Legislature feared would bring a fiscal emergency to the state's local governments. We invalidated the law as an unconstitutional impairment of the wage agreements, concluding that "respondents have clearly failed to satisfy their threshold burden of demonstrating that the substantial abridgement of petitioners' contract rights to an increase in wages was warranted by a grave fiscal crisis, and they advance no other justification for the impairment." (*Sonoma Employees*, at pp. 313–314.)

In justification of the heightened degree of scrutiny applied when the state seeks to alter its own contractual obligations, we explained in *Sonoma Employees*, quoting *U.S. Trust*, *supra*, 431 U.S. at pages 1, 26, 29, 30–31, that " 'a governmental entity can always find a use for extra money . . . . If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all . . . . [A] State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors . . . . [A] State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.' " (*Sonoma Employees*, *supra*, 23 Cal.3d at p. 308.)

### b. Contract clause protection of public employee pension rights in California

As we discussed in *Cal Fire*, a public employee has no express contractual rights in a pension plan created by statute, like CERL. (*Cal Fire*, *supra*, 6 Cal.5th at pp. 977–978, 984–985.) Nonetheless, we have recognized, at least since *Kern v. City of Long Beach* (1947) 29 Cal.2d 848 (*Kern*), that such plans create *implied* contractual rights that are protected against legislative impairment by the contract clause. (*Cal Fire*, at pp. 984–985.) The parties agree that the provisions of CERL, although statutory, are protected by the contract clause. (But see fn. 29, *post*.)

With respect to that constitutional protection, our decisions have established a standard specifically tailored to the unique circumstances presented by public employee pension reform. A modification of the pension rights accorded to a public employee at the time he or she commenced public employment, or of pension rights made available subsequently during the course of his or her public career, will be upheld against a contract clause challenge only if it satisfies the test established in *Allen I*: "An employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. [Citations.] Such modifications must be reasonable . . . . To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages." (*Allen I*, *supra*, 45 Cal.2d at p. 131; see also *Betts v. Board of Administration* (1978) 21 Cal.3d 859, 866 (*Betts*) [contract clause protects not only pension rights available at commencement of employment but also those "which are thereafter conferred during the employee's subsequent tenure"].) This quotation from *Allen I* is the foundation of the California Rule. By analogy to the federal standard, it defines when a modification of public employee pension rights will survive contract clause scrutiny as "reasonable and necessary to serve an important public purpose." (*U.S. Trust*, *supra*, 431 U.S. at p. 25.)

A review of the rule's historical development will help to explain its requirements. As we first recognized over a century ago in *O'Dea v. Cook* (1917) 176 Cal. 659, when a public employee renders service under a pension statute "the pension provisions become a part of the contemplated compensation for those services and so in a sense a part of the contract of employment itself." (*Id.* at pp. 661–662; see *Cal Fire, supra*, 6 Cal.5th at p. 984.) In squaring this insight with the traditional rule that statutes do not create contractual rights, our subsequent decision in *Kern* held that "public employment gives rise to certain obligations which are protected by the contract clause of the Constitution, including the right to the payment of salary which has been earned. Since a pension right is 'an integral portion of contemplated compensation' [citation], it cannot be destroyed, once it has vested, without impairing a contractual obligation." (*Kern, supra*, 29 Cal.2d at pp. 853.) It is the nature of pension rights as deferred compensation that caused *Kern* to hold them protected under the contract clause. (*Cal Fire*, at pp. 984–985.)

In and after *Kern*, we have attempted to define the constitutionally appropriate balance between preserving public employee pension rights and granting the Legislature the flexibility necessary to cope with changing circumstances. In *Kern*, the defendant city had terminated its safety officer pension plan, providing no replacement, mere days before the plaintiff officer completed the 20 years of service necessary to qualify for a pension. (*Kern, supra*, 29 Cal.2d at p. 850.) We had no difficulty finding that the wholesale elimination of previously available pension benefits works a substantial impairment of an employee's implied contractual rights. (*Id.* at p. 853 [although

46

pension statutes can be modified, "it does not follow that an employee may be deprived of all pension benefits by a repeal of the statute without the enactment of a substitute"].) As we concluded, allowing a last minute repeal of pension rights "would defeat one of the primary objectives in providing pensions for government employees, which is to induce competent persons to enter and remain in public employment," because "the promise of a pension annuity would either become ineffective as an inducement to public employees or it would become merely a snare and a delusion to the unwary." (*Id.* at p. 856.)

Given the complete elimination of the plaintiff's pension plan in *Kern*, we recognized that "[t]he permissible scope of changes in the provisions [of a public pension plan] need not be considered here . . . ." (*Kern, supra*, 29 Cal.2d at p. 855.) Yet we made observations that subsequently influenced the resolution of this issue. *Kern* acknowledged that "[t]he rule permitting modification of pensions is a necessary one since pension systems must be kept flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system and carry out its beneficent policy." (*Id.* at pp. 854–855.) Because of that necessity, we concluded, "[A]n employee may acquire a vested contractual right to a pension but . . . this right is not rigidly fixed by the specific terms of the legislation in effect during any particular period in which he serves. The statutory language is subject to the implied qualification that the governing body may make modifications and changes in the system. The employee does not have a right to any fixed or definite benefits, but only to a substantial or reasonable pension. There is no inconsistency therefore in

47

holding that he has a vested right to a pension but that the amount, terms and conditions of the benefits may be altered." (*Id*. at p. 855.)

The question of the permissible scope of pension plan modifications came before the court again in *Packer v. Board of Retirement* (1950) 35 Cal.2d 212 (*Packer*). The plaintiff in *Packer* was the widow of a Los Angeles County peace officer who died a few years after retiring. Four years before the deceased's retirement, as part of a larger pension reform, the applicable pension ordinance was amended to grant benefits to an officer's surviving spouse only if the officer accepted a lesser retirement benefit. Previously, such surviving-spouse benefits had been available as a matter of course to all officers. Because the plaintiff's husband did not elect the lower benefit alternative, the retirement board found that she was not entitled to benefits upon his death. (*Id*. at pp. 213–214.)

In addressing the constitutional propriety of the modification of the surviving spouse provisions, *Packer* first acknowledged *Kern*'s ruling that some pension modification is permitted to allow state and local governments the flexibility to cope " 'with changing conditions and at the same time maintain the integrity of the system.' " (*Packer*, *supra*, 35 Cal.2d at p. 214.) With respect to the particular modification at issue in *Packer*, we noted that "under certain circumstances" the larger reform of which the challenged provision was a part "would give county peace officers and their families greater benefits than they had before." (*Id*. at p. 218.) Pensions continued to be paid to the surviving spouses of officers who died from service-related causes, for example, and these were doubled in amount by the pension reform. Other basic terms and conditions of retirement

were unchanged.  In addition, of course, the amended statute continued to make available a general surviving spouse benefit to retirees, albeit on condition of their accepting a lesser benefit during their own life.  (*Id.* at pp. 218–219.)  Taking the changes as a whole, we concluded, it was "difficult, if not impossible," to determine whether the "total value" of an officer's pension rights had been diminished by the amendments.  (*Id.* at p. 219.)  Because "[i]t is reasonably clear . . . that the employees, including [the plaintiffs' decedent], retained rights to substantial pension benefits," we held that the amendment "did not exceed the scope of a permissible modification."  (*Id.* at p. 219.)

Soon after, we again confronted the issue in *Wallace v. City of Fresno* (1954) 42 Cal.2d 180 (*Wallace*).  The plaintiff, a former police chief who retired in 1949, was stripped of his pension benefits after a postretirement conviction for tax fraud.  (*Id.* at pp. 181–182.)  The city had enacted its pension plan for peace officers in 1923, early in the plaintiff's career.  The initial plan had no provision for depriving a retiree of benefits, but in 1927 the governing ordinance was amended to require the termination of the pension benefits of a retiree who was convicted of a felony or a crime of moral turpitude.  (*Id.* at p. 182.)  Although *Wallace* assumed that the felony conviction provision would have been enforceable if contained in the original pension ordinance, we held that its application to the plaintiff triggered the contract clause because its adoption during his employment constituted a modification of the terms of his pension plan.  As we framed the question, we were required to "determine whether the changes made come within the bounds of a reasonable modification or whether their effect

is to impair his vested contractual rights." (*Wallace*, at pp. 183–184.) We again recognized that modification of a pension plan is permitted to cope with changing times, but we balanced this principle against "the facts that pension payments are deferred compensation to which a pensioner becomes entitled upon performing all services required under the contract and that his retirement because of age ordinarily shows that he has done everything necessary to entitle him to payment of the pension." (*Id.* at pp. 184–185.) We concluded that the amendment was not a reasonable modification. As we explained, "[t]he termination of all pension rights upon conviction of a felony after retirement does not appear to have any material relation to the theory of the pension system or to its successful operation. Rather, the change was designed to benefit the city and, as stated in the city's brief, to meet the objections of taxpayers who would be opposed to contributing funds for the maintenance of a pensioner who had been convicted of a felony." (*Id.* at p. 185.)

The foregoing three decisions were synthesized in *Allen I*, *supra*, 45 Cal.2d 128, which articulated the standard for contract clause protection of public employee pension benefits that persists to this day. *Allen I* was the second chapter of the story introduced in *Kern*, which addressed the elimination in 1945 of the public safety officer pension system of the City of Long Beach. Presumably as a result of the ruling in *Kern*, the city restored the pension plan for officers hired prior to its elimination. Subsequently hired officers, however, worked without a pension plan until 1950, when the city entered them in the state pension system. (*Allen I*, at p. 130.) The following year, the city amended the original pension plan applicable to the officers hired before 1945 in three ways: (1) employee

pension contributions were increased fivefold, from two percent of salary to ten percent; (2) the city switched from a fluctuating pension benefit, which was pegged to the salary paid to current employees in the retiree's final job position, to a fixed benefit, which was determined by the retiree's own late career salary; and (3) employees who were granted pension plan service credit for a leave of absence for military service were, for the first time, required to make contributions to the plan in return for the service credit. (*Id.* at pp. 130–131.) The affected officers challenged each of these changes as a violation of the contract clause.

Citing *Wallace*, *Packer*, and *Kern*, we acknowledged that vested pension rights may be modified "for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system." (*Allen I*, *supra*, 45 Cal.2d at p. 131.) More specifically, we held, "Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages." (*Ibid.*) Applying this rule, we rejected all three of the modifications, concluding that the plan amendment "substantially decreases plaintiffs' pension rights without offering any commensurate advantages, and there is no evidence or claim that the changes enacted bear any material relation to the integrity or successful operation of the [preexisting] pension system . . . ." (*Ibid.*)

Our reasoning in rejecting the individual modifications gave substance to the rule's requirements. We began with a consideration of the disadvantages and comparable new advantages. Our discussion of the increase in the contribution rate was short and pointed: "The provision . . . obviously constitutes a substantial increase in the cost of pension protection to the employee without any corresponding increase in the amount of the benefit payments he will be entitled to receive upon his retirement." (*Allen I, supra,* 45 Cal.2d at p. 131.) Our consideration of the switch to a fixed pension benefit was more deliberate. As we pointed out, a fixed pension benefit is unresponsive to changing economic conditions. In contrast, tying the amount of the benefit to a current employee's salary permits retirees to "maintain a fairly constant standard of living despite changes in our economy," since it is assumed that current salaries will reflect those changes. (*Id.* at p. 132.) Particularly because the post-war period was "an era of rising salaries and high cost of living," we concluded that "plaintiffs' rights would be adversely affected by the change to the fixed benefit plan." (*Ibid.*) Our rationale for questioning the newly required contributions in return for credit for military service was similar to that of the increased ordinary contributions. "The provision . . . imposes a considerable financial burden upon those who, while in the armed forces, earn less than they would earn as city employees, and it raises the cost to them of pension protection without securing any advantage in addition to that which they already enjoyed." (*Id.* at p. 133.)

After concluding that each of the changes was, for the reasons stated, disadvantageous to pre-1945 hires, we addressed the purpose of the changes. *Allen I* first noted that

the changes were not adopted out of concern for the financial stability of the pension system. "The city does not claim that any of the provisions contained in [the amendment] was necessary to preserve or protect the pension program applicable to [pre-1945 hires], and there is no indication that the city would have difficulty in meeting its obligations to those employees under the provisions of [the original pension plan]." (*Allen I, supra*, 45 Cal.2d at p. 133.) Instead, we observed, the city explained that "the changes . . . were enacted in order to make the pension system for [pre-1945 hires] more nearly coincide with the retirement system established . . . for policemen and firemen employed after that date, thus to ameliorate 'personal [sic] problems' assertedly created by differences in pension costs and benefits to the two groups of employees and to 'somewhat equalize the compensation provided for employees who perform like services.' " (*Ibid.*)

We concluded that this rationale was insufficient to justify the impairment of pension benefits caused by the various changes. As we explained, "[s]uch purposes, however beneficial to the city, bear no relation to the functioning and integrity of the pension system established for persons employed prior to [1945] and constitute no justification for materially reducing the vested contractual rights earned by plaintiffs prior to the time [the charter amendment] was adopted." (*Allen I, supra*, 45 Cal.2d at p. 133.)

In sum, when evaluating modifications to a public employee pension plan under the contract clause, *Allen I* requires a court first to determine whether the modifications impose an economic disadvantage on affected employees and, if so, whether those disadvantages are offset in some manner by

comparable new advantages.[22]  The court must then determine whether the government's articulated purpose in making the changes was sufficient, for constitutional purposes, to justify any impairment of pension rights.  Although changes may be enacted "for the purpose of keeping [the] pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system," such changes "must bear some material relation to the theory of a pension system and its successful operation."  (*Allen I, supra*, 45 Cal.2d at p. 131.)

In the intervening 65 years, our decisions have clarified aspects of the *Allen I* test, but its substance is unchanged.[23]  In

---

[22]    Neither *Allen I* nor any of our subsequent pension decisions have addressed a situation in which all economic disadvantages of a pension modification were offset by comparable new advantages.  Such an argument was made in *Betts, supra*, 21 Cal.3d at pages 864-865, but we found it inapplicable in the circumstances presented.  (*Id*. at p. 867.)  In *Packer*, which predated *Allen I*, we held that the contract clause was not violated upon finding that it was "difficult, if not impossible," to determine whether the "total value" of an officer's pension rights had been diminished by the challenged amendments.  (*Packer, supra*, 35 Cal.2d at p. 219.)  *Packer* can therefore be interpreted as holding that no contract clause violation results when a pension plan modification provides fully compensating new advantages. We note, however, that the determination of disadvantages and comparable advantages was made collectively in *Packer*, rather than as to individual employees. (See *Packer*, at p. 218.)  This collective approach was effectively disavowed in *Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438, 449 (*Abbott*).

[23]    Plaintiffs argue that, in *Olson v. Cory* (1980) 27 Cal.3d 532, we held that a modification of pension rights is "per se

*Abbott*, *supra*, 50 Cal.2d 438, we employed the rationale articulated in *Allen I* in concluding that the change from a fluctuating to a fixed pension benefit could not properly be applied to persons who were employed by the defendant city at the time the change occurred, even though the change had occurred 35 years earlier. (*Abbott*, at pp. 453–455.) In the process, we explained that the determination of disadvantages and comparable new advantages must be made individually as to each affected employee, rather than on the basis of the employees as a group. (*Id.* at p. 449; see similarly *Betts*, *supra*, 21 Cal.3d at p. 864.)

In analyzing a similar constitutional issue in *Betts*, *supra*, 21 Cal.3d 859, we entertained the argument that, as a general matter, the change from a fluctuating benefit to a fixed benefit adjusted annually for inflation could pass constitutional muster because such a change represented the replacement of "one 'cost of living' formula" for another. (*Id.* at p. 865.) We found it unnecessary to rule on that argument, however, because the Legislature had adopted the cost of living adjustment at a time when pension benefits were still determined by the fluctuating

---

unreasonable" if it is permanent, rather than temporary. *Olson* rendered no such holding. At the point in the decision cited by plaintiffs, *Olson* merely summarized four factors considered by the Supreme Court in *Blaisdell*, *supra*, 290 U.S. 398, in deciding whether a particular impairment of private contracts was unconstitutional. One of these was whether the impairment was permanent or temporary. Contrary to plaintiffs' claim of "per se" unreasonableness, none of the factors was characterized as determinative on its own. (See *Olson* at p. 539; *Blaisdell*, at p. 441.) Neither *Olson* nor any other decision of this court has held that an impairment of contracts is unconstitutional solely because it is permanent, rather than temporary.

method. The change to a fixed benefit did not come until several years later. Accordingly, we held, the plaintiff had a vested right to both a fluctuating pension benefit *and* the cost of living adjustment, since those advantages were offered simultaneously by the pension plan during his public service. (*Id*. at p. 866 ["An employee's contractual pension expectations are measured by benefits which are in effect not only when employment commences, but which are thereafter conferred during the employee's subsequent tenure"].)

Thereafter, in *International Assn. of Firefighters v. City of San Diego* (1983) 34 Cal.3d 292 (*Firefighters*), our court made explicit what was already implicit in the vested rights doctrine, namely, that the contract clause does not protect public employees against adverse changes in the manner in which a pension plan is implemented that are authorized by the existing terms of the plan, rather than as a result of legislative changes to those terms. (*Id*. at pp. 301–302 [holding that an increase in employee contribution rates pursuant to the existing terms of a pension plan does not violate vested rights].)

Although we have addressed pension-related contract clause issues in a few other decisions rendered in the years since *Betts*, these decisions applied the principles established in *Allen I*, *Abbott*, and *Betts* without changing their substance. (E.g., *City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 471–472 (*Huntington Beach*); *Eu, supra*, 54 Cal.3d at p. 529; *Allen v. Board of Administration* (1983) 34 Cal.3d 114 (*Allen II*).) Our last decision to touch on these issues, issued over 25 years ago, continued to cite the test established in *Allen I*. (*Huntington Beach*, at p. 472.)

Although it did not otherwise augment our contract clause jurisprudence, *Allen II* has caused some confusion. When summarizing the test applied to pension plan modifications under the contract clause, the decision stated that when such a change results in disadvantages to employees, it "must" be accompanied by comparable new advantages. (*Allen II*, *supra*, 34 Cal.3d at p. 120.) This differed from the formulation in *Allen I*, which held that disadvantages "should" be accompanied by new advantages. (*Allen I*, *supra*, 45 Cal.2d at p. 131.) Based on this inconsistency, the Court of Appeal in the decision under review concluded that "the Supreme Court changed the formulation of its reasonableness test" in *Allen II*. (*Alameda Sheriffs*, *supra*, 19 Cal.App.5th at p. 120.) Although the court's conclusion is understandable, we conclude that *Allen II* did not modify the rule of *Allen I*. Other than its isolated use of the word "must," there is no reason to believe that *Allen II* intended a modification. The two Supreme Court cases *Allen II* cited as its source for the test, *Allen I* and *Abbott*, both use the word "should." *Allen II* did not indicate an intent to change the governing standard, let alone attempt to justify it, as would ordinarily occur if we intended to effect a material change in the law, and the distinction between "must" and "should" played no role in the resolution of *Allen II*. Further, our subsequent decisions have never recognized a change in the test. All of our later decisions mentioning this standard use the word "should," including a decision issued only one month after *Allen II* and authored by the same justice. (*Firefighters*, *supra*, 34 Cal.3d at p. 301; see also *Huntington Beach*, *supra*, 4 Cal.4th at p. 472; *Eu*, *supra*, 54 Cal.3d at pp. 529–530.) A different division of the First District Court of Appeal examined the same question in

*Marin County* and, after a careful analysis, concluded that
" '[s]hould,' not 'must,' remains the court's preferred expression."
(*Marin County*, *supra*, 2 Cal.App.5th at p. 699, review granted;
see similarly, *Hipsher v. Los Angeles County Employees
Retirement Assn* (2018) 24 Cal.App.5th 740, 753, review granted
Sept. 12, 2018, S250244 [use of "must" in *Allen II* not to be taken
literally].)  The one-time use of "must" in *Allen II* appears to
have been inadvertent, and it should not be understood to have
changed the *Allen I* standard.

### 2. PEPRA's amendment of section 31461 constituted a modification of CERL

As the Court of Appeal recognized, a legislative action
cannot be found to have impaired public employee pension
rights unless the action constituted a modification of the pension
system.  (*Alameda Sheriffs*, *supra*, 19 Cal.App.5th at p. 96
["whether the changes to section 31461 . . . unconstitutionally
impair the vested pension rights . . . depends, at least as an
initial matter, on whether those changes actually modified
CERL"].)  Changes in the implementation of a pension plan that
occur pursuant to its existing terms and conditions, for example,
do not support a claim of impairment.  (*Firefighters*, *supra*,
34 Cal.3d at pp. 301–302 [increase in employee contribution
rates pursuant to the provisions of a pension plan does not
violate the contract clause].)  A change in the language of a
statute or ordinance governing a pension plan that does not
change the manner in which it is implemented similarly does
not support a claim of impairment.  (*Gatewood v. Board of
Retirement* (1985) 175 Cal.App.3d 311, 319 (*Gatewood*)
[statutory amendment that was consistent with existing judicial
interpretation did not give rise to contract clause claim].)

Legislation amending unambiguous statutory language or effectively overruling a settled judicial interpretation of statutory language, however, undoubtedly constitutes a constitutionally cognizable modification of employee pension rights, assuming the legislation materially changed the manner in which the pension system is implemented. We conclude that the amendment of section 31461 to add subdivision (b)(1) through (3) constituted a change in the law because those provisions narrowed the expansive interpretation of compensation earnable adopted in *Ventura County*.[24]

---

[24]    When it is unclear whether the legislation actually effects a change in the governing law — that is, when neither the preexisting language of the statute nor a judicial decision resolves the issue addressed by the legislation — it cannot be said with equal confidence that the legislation impairs existing pension rights. The State and the District argue that an amendment of ambiguous statutory language governing pension rights does not constitute a modification for purposes of the contract clause, so long as the amendment qualifies as a clarification of the statute. (See *Protect our Benefits v. City and County of San Francisco* (2015) 235 Cal.App.4th 619, 636-637 [considering whether a contract clause claim should be denied because a change in the governing ordinance was a clarification of an earlier ordinance]; *In re J.C.* (2016) 246 Cal.App.4th 1462, 1479-1480 [in determining the retroactivity of a statutory amendment, an amendment that adopts a reasonable interpretation of a previously ambiguous statute is regarded as clarifying, rather than changing, the law].) Given the very general language of section 31461, defendants argue that PEPRA's amendments should be viewed as clarifying, rather than changing, the definition of compensation earnable. In light of our conclusion, explained hereafter, that the PEPRA amendment of section 31461 is properly considered a change of the interpretation of section 31461 rendered in *Ventura County*

### *a.* Ventura County *adopted a broadly inclusive definition of "compensation earnable"*

Our sole decision addressing the scope of "compensation earnable" is *Ventura County*, *supra*, 16 Cal.4th 483, in which we considered whether "various payments by the county over and above the basic salary paid to all employees in the same job classification are 'compensation' within the meaning of the [CERL] statute" (*id.* at p. 487) and clarified the meaning of compensation earnable under section 31461. We began by recognizing that the statutory terms "compensation" and "compensation earnable" are "ambiguous in some respects" and fail clearly to resolve the status of items of compensation beyond basic salary or wages. (*Ventura County*, at p. 493.) Regarding the first issue, the status of payments over and above base salary, we began with the statutory definition of compensation as "remuneration paid in cash . . . , but [not] the monetary value of board, lodging, fuel, laundry, or other advantages furnished to a member." (§ 31460; see *Ventura County*, at pp. 490–491.) Accepting the implications of a literal reading of this language, we held that the term includes all compensation paid in cash, while excluding any benefits conferred in a form other than cash. (*Ventura County*, at p. 497.) We applied this ruling to hold that a wide variety of cash payments that supplement an employee's base pay are included in "compensation," including uniform allowances, cashed-out leave time, bilingual premium

---

rather than a clarification of the statutory language, it is unnecessary for us to decide whether the Legislature's clarification of ambiguous statutory language would avoid contract clause scrutiny.

pay, pay for field training officer and motorcycle duty, holiday pay, and educational incentive pay. (*Id*. at pp. 497–498.)

Having settled the issue of compensation, we turned to the meaning of compensation earnable, which bore the definition now found in section 31461, subdivision (a). (*Ventura County*, *supra*, 16 Cal.4th at p. 499.) As discussed above, we ruled that " 'compensation earnable' is the average pay of the individual retiring employee computed on the basis of the number of hours worked by other employees in the same class and pay rate — that is[,] the average monthly pay, excluding overtime, received by the retiring employee for the average number of days worked in a month by the other employees in the same job classification at the same base pay level." (*Id*. at p. 504.) In reaching that conclusion, we relied in part on the similar language that was at one time used to define "compensation earnable" in the CalPERS statute. (*Ibid*.) The CalPERS language had been repealed a decade earlier and replaced with a more detailed statute, which included a new category of items of compensation labeled "special compensation." Although this legislation "recast[] and redefine[d]" compensation earnable under CalPERS, we found no indication "that the inclusion of 'special compensation' in the definition adds anything that was not included under the prior legislation." (*Id*. at p. 505.) As we observed, many of the items of compensation that the *Ventura County* plaintiffs sought to include in CERL's compensation earnable "appear to be the type of 'special compensation' items which are included in the 'compensation earnable' of PERS members." (*Ventura County*, at p. 504.) On that basis, we held that all of the various "premiums in dispute" are included in compensation earnable. (*Id*. at p. 505.) Although we did not

specifically identify these premiums, the phrase appears to refer to all of the "items plaintiffs seek to have included in their 'compensation earnable.' " (*Id.* at p. 504.)

### b. *Subdivision (b)(4) did not modify CERL*

We first address the pre-PEPRA status of termination pay, now excluded by section 31461, subdivision (b)(4), because it is the only aspect of section 31461 specifically addressed by a published appellate decision following *Ventura County*. As discussed above, the definitions of "compensation" and "compensation earnable" adopted in *Ventura County* effectively overturned aspects of *Guelfi, supra,* 145 Cal.App.3d 297, which had guided the implementation of section 31461 prior to *Ventura County*. Our disapproval of *Guelfi*'s long-standing rulings spawned a variety of lawsuits statewide by county employees and pensioners, as we anticipated. (*Ventura County*, *supra*, 16 Cal.4th at p. 507). These lawsuits were consolidated in a single proceeding, and those that did not settle became the subject of *Retirement Cases, supra,* 110 Cal.App.4th 426.[25]

Among the issues addressed by *Retirement Cases* was the inclusion in final compensation of "termination pay," which the court defined as "one-time cash payments made to plan members upon retirement for accrued but unused compensatory time, sick leave time, and vacation or holiday time." (*Retirement Cases, supra,* 110 Cal.App.4th at p. 473.) *Retirement Cases*

---

[25] The lawsuits in Alameda, Contra Costa, and Merced County that resulted in the settlement agreements addressed *ante*, part II.A of this decision, were included in the consolidated proceeding in *Retirement Cases*, but each was settled prior to the trial court's entry of judgment in the proceeding.

recognized that *Ventura County* had defined such payments as compensation. The court ruled, however, that they were *not* a part of "final compensation" because, under the relevant statutes, the period for calculating final compensation "extends up to, but does not include retirement." (*Id.* at p. 474; see §§ 31462, 31462.1.) Until the cash compensation was received, the accrued leave time remained an in-kind benefit, excluded from compensation under section 31460. Yet at the time the cash was received, the final compensation period had ended. (*Retirement Cases*, at p. 474.) This ruling was subsequently adopted in *Salus v. San Diego County Employees Retirement Assn.* (2004) 117 Cal.App.4th 734, 740.

Because *Retirement Cases* and *Salus* remained good law at the time PEPRA was enacted, section 31461, subdivision (b)(4) made no material change in the implementation of CERL. Subdivision (b)(4) addresses "[p]ayments made at the termination of employment." Assuming, as the Court of Appeal concluded (*Alameda Sheriffs, supra,* 19 Cal.App.5th at p. 104), that this phrase refers to the same type of payments deemed "termination pay" by *Retirement Cases* and *Salus* — that is, payments made after the employment relationship ends — CERL already restricted the pensionability of termination pay when PEPRA became law.[26] As so interpreted, subdivision

---

[26] Alternatively, it can be argued that section 31461, subdivision (b)(4), which governs "[p]ayments made at the termination of employment," includes payments made in anticipation of an employee's imminent retirement but received prior to termination. Interpreted in this manner, subdivision (b)(4) would constitute a narrowing of the broad ruling of *Ventura County*. In that case, however, subdivision (b)(4) would

(b)(4) did not impair county employee pension rights for purposes of the contract clause.

### c.  *Subdivision (b)(1), (2), and (3) effected a change in CERL*

We have not located any other pre-PEPRA judicial decision that addresses the inclusion in compensation earnable of the remaining items excluded or limited by the PEPRA amendment.[27] We conclude, however, that the ruling in *Ventura County* was sufficiently clear in including within compensation earnable the items of compensation now excluded or limited by section 31461, subdivision (b)(1) through (3) that these provisions must be considered a change in the law for purposes of the contract clause.

As noted above, *Ventura County*'s consideration of these issues was brief and relatively summary, but the decision appears to include the items excluded or limited by the PEPRA amendment within the definition of compensation earnable. The decision began with a consideration of CERL's definition of "compensation" in section 31640, which concluded that the definition includes virtually any item of cash compensation received by a county employee.  As the court explained, "[w]hen paid in cash, the payment is remuneration and, as it is not

---

also be largely coextensive with subdivision (b)(2).  Because the interpretive issue is not material to our resolution of this matter, we do not address it further.

[27]  Section 31461, subdivision (c) states that "[t]he terms of subdivision (b) are intended to be consistent with and not in conflict with the holdings" in *Retirement Cases* and *Salus*, but neither decision addresses a relevant issue other than termination pay.

excluded, it is 'compensation' under section 31460." (*Ventura County*, *supra*, 16 Cal.4th at p. 497.) Although that sentence related specifically to "cash payments made in lieu of providing the same advantages in kind" (*ibid.*), it captures the court's general ruling regarding the meaning of "compensation." This term, of course, is the foundation for compensation earnable, which is defined as "the average *compensation* . . . for the period under consideration." (§ 31461, subd. (a), italics added.) Given the broad definition of "compensation" adopted by *Ventura County* and the absence of any limitations on that term as it is used in section 31461, it is reasonable to construe the decision as holding that compensation provided as cash remuneration, if not expressly excluded from compensation earnable, is included in that term. Because none of the items excluded or limited by subdivision (b)(1) through (3) was excluded prior to PEPRA, the exclusion of those items must be regarded as a change in the law.

Our discussion in *Ventura County* of the specific items of compensation there at issue is consistent with this interpretation. As noted above, the court held that all of the "premiums in dispute" are included within compensation earnable, presumably referring to all of the items put at issue by plaintiffs. (*Ventura County*, *supra*, 16 Cal.4th at p. 505.) Those items included, among others, "additional compensation for scheduled meal periods for designated employees, pay in lieu of annual leave accrual, holiday pay, . . . [and] a longevity incentive." (*Id.* at pp. 488–489; see *id.* at pp. 488–489, fns. 6, 7, 11 & 12.) These items are similar to those subsequently excluded or limited by section 31461, subdivision (b)(2) and (3)

— and yet *Ventura County* had ruled that they are included within compensation earnable.

Defendants argue that CERL had never permitted the inclusion in compensation earnable of the various items of compensation excluded or limited by section 31461, subdivision (b)(1) to (3). The argument is not based on *Ventura County* or any other judicial interpretation of CERL, but rather on defendants' own interpretations of the language of the governing statutes. In effect, they argue, the pre-PEPRA provisions of CERL *should have been* interpreted to exclude these items. Even assuming their interpretive arguments have merit, our consideration of a change in the law must focus on how the governing statutes *were* interpreted, not how they might have been interpreted. Our contract clause jurisprudence is designed, at least in part, to protect the reasonable expectations of public employees covered by the pension plan. (*Betts*, *supra*, 21 Cal.3d at p. 866; see *Cal Fire*, *supra*, 6 Cal.5th at p. 989, fn. 14.) Those reasonable expectations are defined not only by the statutes themselves, but also by judicial interpretations of those statutes. Employees can reasonably expect their pensions to be calculated according to existing judicial interpretations, at least until those interpretations are limited or overruled by subsequent authority. Because, as discussed above, *Ventura County* adopted a broad interpretation of compensation earnable and because that interpretation was never changed or otherwise limited by subsequent judicial or statutory authority prior to PEPRA, we measure the PEPRA

amendment against that interpretation, not by a different interpretation that might have been adopted.[28]

The District, for example, relies on an argument made to the Contra Costa County retirement board by its outside counsel, who opined that the term "final compensation" should be interpreted to limit the inclusion of cashed out leave time to leave time actually earned by the employee during a final compensation year. Although we might have accepted that argument had it been presented in *Ventura County*, it was not. Our decision was unqualified in this regard. Similarly, the State argues that the compensation excluded by section 31461, subdivision (b)(1) was "never pensionable" under CERL because "the idea of basing a public employee's pension on payments intended to spike the member's retirement benefit, and not exclusively on compensation for faithful service, contradicts the fundamental theory of a pension system." Although this is another plausible argument, *Ventura County* made no such exception in its general ruling that compensation earnable includes all non-excluded cash remuneration. The State's arguments regarding subdivision (b)(2) and (3) similarly rely on its own statutory constructions, rather than the actual ruling of *Ventura County*. For the reasons discussed above, we conclude that, when measured against a reasonable reading of the only

---

[28] Our conclusion might be different if the Legislature had timely amended an ambiguous statute in a manner contrary to the interpretation adopted in a judicial decision, suggesting its disagreement with the court's interpretation, as occurred in *Gatewood, supra,* 175 Cal.App.3d 311. Because the Legislature did not amend CERL in response to *Ventura County*, that situation is not before us.

applicable judicial guidance — our ruling in *Ventura County* —
subdivision (b)(1), (2), and (3) changed the law of compensation
earnable.

### 3. *PEPRA's amendment of CERL is not constitutional merely because it applies only to pension benefits awarded after its enactment*

Before turning to the application of the California Rule to
subdivision (b)(1) to (3) of section 31461, we address an
argument prominently urged by the State to support the
constitutionality of the PEPRA amendment. Regardless of the
impact on the pensions of county employees who retire after its
effective date, the State argues, the PEPRA amendment "could
not have impaired any vested rights, because [PEPRA's
changes] only operate prospectively." According to the State,
PEPRA should be held consistent with the contract clause
because it "does not affect the pension of anyone who retired
before its effective date. Nor does it *retroactively* re-characterize
the pensionability of any item that was earned and already
included in an employee's final pensionable compensation before
[its] effective date." The argument disregards our long-standing
contract clause jurisprudence, but there is another, more
fundamental reason to reject it. The argument misunderstands
the retroactive effect of the PEPRA amendment on county
employee pension benefits.

It goes almost without saying that the State's argument is
inconsistent with our prior pension decisions, and the State
makes no attempt to reconcile its position with those decisions.
The contention, in essence, is that the PEPRA amendment is
prospective because it does not change the pension benefits of
persons who have already retired or the pensionability of items

of compensation earned by county employees who are sufficiently near to retirement to have entered the final compensation period. So long as modifications of pension law are prospective as so defined, the State argues, the Legislature is unconstrained by the contract clause. Our decisions are fundamentally at odds with this conception of the contract clause. In *Kern*, our first decision to grapple with the requirements of the contract clause, the pension modification — in fact, a wholesale repeal — applied only to "persons not then eligible for retirement." (*Kern, supra,* 29 Cal.2d at p. 850.) We did not suggest that this limitation avoided the contract clause issue; on the contrary, we overturned the repeal. (*Kern,* at p. 856.) In several subsequent decisions we found pension modifications untenable under the contract clause. None of those modifications applied to persons already retired, yet that restriction did not preserve their constitutionality. Nor did we suggest that they would have survived constitutional scrutiny if only their impact had been limited to persons who had not entered the final compensation period. (E.g., *Eu, supra,* 54 Cal.3d at pp. 530–532 [ballot initiative's pension modifications could not be applied to state legislators who assumed office prior to its passage]; *Betts, supra,* 21 Cal.3d at p. 867 [pension modification could not be applied to plaintiff, who was employed by the state prior to its enactment]; *Abbott, supra,* 50 Cal.2d at pp. 453–455 [holding that a pension modification enacted 35 years earlier could not be applied to persons who were employed by the defendant city at the time the change occurred]; *Allen I, supra,* 45 Cal.2d at pp. 131–133.) On the contrary, the State's argument is entirely at odds with our contract clause jurisprudence.

Because it misunderstands the impact of prospective application in this context, the State's argument does not persuade us to modify our long-standing jurisprudence. In evaluating the proper scope of contract clause protection for pension rights, it is important to recognize the unusual nature of such rights as compensation. Public employees begin earning pension benefits from their first day of work. As a result, we have consistently held that pension rights become vested at that time. (*Kern, supra*, 29 Cal.2d at p. 855 [a public employee "has actually earned some pension rights as soon as he has performed substantial services for his employer"]; *Dryden v. Board of Pension Commissioners* (1936) 6 Cal.2d 575, 579 [right to pension becomes vested upon acceptance of employment]; *McGlynn v. State of California* (2018) 21 Cal.App.5th 548, 558–559 [vested pension rights accrue upon commencement of work].) Yet the value of pension rights is not determined until the end of an employee's career, when the retiring employee's pension benefit is calculated. CERL perfectly illustrates this. The amount of a CERL pension benefit is based on a county employee's years of service, age at retirement, and compensation during a specific one or three-year period. The first two cannot be determined until retirement, and pensionable compensation is also normally determined near, if not at, the end of the employee's career. Further, it is the law in effect at the time of retirement that is used to calculate the amount of an employee's pension benefit. Generally speaking, the law prevailing during the period when pension rights are earned — that is, during an employee's career — does not factor into the calculation of the value of those pension rights unless

that law is still in effect when the pension benefit is calculated — i.e., at retirement.

Because it is the law in effect at the end of a public employee's career that is used to determine the amount of the pension benefit, most modifications of the provisions governing the benefit calculation have, in practice, a profoundly retroactive impact on persons who began their employment prior to the modification. From early on, we have acknowledged that the Legislature may modify the statutory terms and conditions governing a public employee's pension over the course of his or her career. (*Kern, supra*, 29 Cal.2d at pp. 853–854, citing *Pennie v. Reis* (1889) 80 Cal. 266 [upholding the Legislature's substitution of a pension plan for the lump-sum death benefit available at the beginning of the plaintiff peace officer's career].) Yet, by normal operation of the pension system, such modifications apply not only to the pension rights accrued by public employees after the effective date of the modification, but also to all pension rights accrued prior. To the extent the modification changes the manner in which a pension benefit is calculated, it changes the value of the pension rights accrued from the very inception of an employee's career. Most significant modifications of a pension plan therefore have an impact reaching far into the past.

For this reason, the State's argument that the PEPRA amendment cannot have violated vested rights because it operates only prospectively is misguided. Although the amendment's provisions apply only to employees who retire after its effective date, its exclusions and limitations are used in the calculation that, by setting the amount of their pension benefit, determines the value of the pension rights these

employees accrued over the entire course of their careers. In practice, county employee pension benefits will be calculated as though the PEPRA amendment was the governing law from the beginning of their careers.

To effect a pension modification that is prospective in *practice*, the Legislature would be required to enact a law that applies only to pension rights accrued after its effective date, while preserving unchanged the law applicable to pension rights accrued prior to that date. Because PEPRA's amendment applies to all pension rights, regardless of when they were accrued, the State's claim of prospective operation is unpersuasive.[29]

### 4. *The PEPRA amendment did not violate the California Rule*

In evaluating the constitutionality of modifications to a public employee pension plan, *Allen I* requires a court first to determine whether the modification imposes disadvantages on affected employees, relative to the preexisting pension plan, and, if so, whether the disadvantages are accompanied by comparable new advantages. Assuming the disadvantages are not offset, the court must then determine whether the legislative body's purpose in making the changes was sufficient, for constitutional purposes, to justify an impairment of pension rights. Although public employee pension plans may be modified "for the purpose of keeping [the] pension system

---

[29] In making this observation, we do not mean to suggest that a change that is prospective in practice would thereby be insulated from contract clause scrutiny under *Allen I*. We intend merely to illustrate the type of amendment that, in the pension context, would be truly prospective in its impact.

flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system," to survive contract clause scrutiny such changes "must bear some material relation to the theory of a pension system and its successful operation." (*Allen I, supra,* 45 Cal.2d at p. 131.) Finally, assuming the changes were made for a proper purpose, one further analytic step is necessary, as explicated below: The Legislature's decision to impose financial disadvantages on public employees without providing comparable advantages will be upheld under the contract clause only if providing comparable advantages would undermine, or would otherwise be inconsistent with, the modification's constitutionally permissible purpose. We conclude that the PEPRA amendment survives this constitutional scrutiny.

### a. *The PEPRA amendment imposed disadvantages on county employees without providing comparable advantages*

There is no question that the PEPRA amendment diminished county employees' pension rights without providing any comparable new advantages. New subdivision (b)(1) through (3) of section 31461 exclude from compensation earnable categories of compensation that, prior to PEPRA, were includable.[30] Although the impact on the pension rights of individual employees will vary, depending on the employee's personal circumstances and the policy adopted prior to PEPRA

---

[30] Because, as explained above, section 31461, subdivision (b)(4) did not change CERL for purposes of the contract clause, we need not evaluate that subdivision under the California Rule. Our conclusion would not, however, be different if subdivision (b)(4) were included in the analysis.

by his or her county retirement board regarding the inclusion of these categories, it seems inescapable that the pension benefits of some county employees will be less than they otherwise would have been as a result of the PEPRA amendment. In the three counties involved in this matter, for example, retirement board policies permitted at least some of the types of compensation excluded by new subdivision (b) to be included in compensation earnable. Because that compensation will no longer be factored into employees' final compensation, diminished pension benefits will result. There is no argument that PEPRA provided affected employees new advantages to offset the financial impact of these exclusions.

> ### b. PEPRA's amendments of CERL were enacted for the constitutionally permissible purpose of conforming pension benefits more closely to the theory underlying section 31461 by closing loopholes and proscribing potentially abusive practices

The second component of the California Rule is the requirement that the changes to a public pension plan have been enacted for a constitutionally permissible purpose. The requirement is premised on the recognition in *Kern*, *supra*, 29 Cal.2d 848, that "[t]he rule permitting modification of pensions is a necessary one since pension systems must be kept flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system and carry out its beneficent policy." (*Id*. at pp. 854–855.) While acknowledging this need for flexibility, we held in *Allen I* that modifications of public pension plans are permissible only if they relate to the operation of the plan and are intended to improve its functioning or adjust to changing conditions, holding

that "alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation . . . ." (*Allen I, supra,* 45 Cal.2d at p. 131.)

Our decisions since *Allen I* have upheld few, if any, pension modifications as properly motivated. Perhaps the closest we have come to sustaining such a change was *Betts, supra,* 21 Cal.3d 859, in which we considered a modification of the pension system serving state officers. The plan originally pegged the amount of officers' pension benefits to the salary of persons currently holding the same office held by the pensioner upon retirement. (*Id.* at p. 862.) The modification at issue changed this means of preserving the purchasing power of pension benefits to an annual cost of living adjustment. (*Id.* at p. 865.) We expressed a willingness to entertain the state's argument that the change was constitutionally permissible because it represented the replacement of "one 'cost of living' formula" with another, but we concluded that the argument could not be sustained "[u]nder the circumstances of this case." (*Ibid.*)

Our decisions have more often given substance to this requirement of *Allen I* by delineating what is *not* a constitutionally permissible purpose. In *Wallace* and *Allen I*, both of which found a violation of contract clause protections, the defendant cities advanced essentially political reasons for the pension modifications at issue. In *Allen I*, the city adopted three changes to a pension system covering senior employees that had the effect of increasing the cost of participation in the plan for employees and diminishing their benefits. The city characterized the changes as an attempt to equalize the pension benefits of the senior employees and more recent hires, who

were covered by a different, less generous pension plan. (*Allen I*, *supra*, 45 Cal.2d at p. 133.) We found this rationale insufficient, reasoning that "[s]uch purposes, however beneficial to the city, . . . constitute no justification for materially reducing the vested contractual rights earned by plaintiffs . . . ." (*Ibid.*) In *Wallace*, *supra*, 42 Cal.2d 180, we rejected as improperly motivated a modification that stripped pension benefits from retirees upon conviction of a felony in order "to meet the objections of taxpayers who would be opposed to contributing funds for the maintenance of a pensioner who had been convicted of a felony." (*Id*. at p. 185.) Finally, in *Abbott*, *supra*, 50 Cal.2d 438, we addressed a city's argument that the modification of its pension plan was justified as an attempt to stem rising pension costs. In defense of its switch from a fluctuating pension benefit, intended to compensate for changes in the cost of living, to a fixed benefit, the city contended that "if the amendments had not been made 'the cost to the City and its taxpayers would have reached such staggering proportions that, in all probability, the system would have ceased to exist.' " (*Id*. at p. 455.) We rejected the argument, observing that the city's hypothetical prediction of costs so great as to lead to the pension system's abolition was speculative and failed to account for the fact that a pension system is essential to attract qualified municipal employees. (*Ibid*.) This left the city to rely only on rising costs, an argument we found insufficient, without more, to justify the change. (*Ibid*.)

Given our past decisions, we have no difficulty finding that the PEPRA amendment was enacted to maintain the integrity of the pension system and "bear[s] some material relation to the theory of a pension system and its successful operation."

(*Allen I, supra,* 45 Cal.2d at p. 131.) As discussed above, the Legislature's primary purpose in enacting the PEPRA amendment was to modify CERL's "very broad and general definition of 'compensation earnable'" to prevent pension spiking. (Assem. Com. on Public Employees, Retirement and Social Security, Analysis of Assem. Bill No. 340 (2011–2012 Reg. Sess.) Apr. 25, 2011, p. 3.) An examination of the changes made by PEPRA demonstrates that the Legislature accomplished this objective by introducing new exclusions and limitations that bring the definition of "compensation earnable" into closer alignment with the preexisting theory underlying CERL's determination of pension benefits. A legislative intent to align the express language of a pension statute more closely with its intended manner of functioning directly relates to both the theory of a pension system and its successful operation.

The definition of "compensation earnable" in section 31461, which specifies the manner in which a retiring employee's compensation is used in calculating his or her pension benefit, is a critical component in establishing the general theory underlying CERL's payment of pension benefits. As discussed above, compensation earnable is based on the retiring employee's average daily rate of pay during the final compensation period, applied over the number of days ordinarily worked during that time by the employee's peers, identified as "persons in the same grade or class of positions during the period." (§ 31461, subd. (a); see *Ventura County, supra,* 16 Cal.4th at p. 504.) Among employees in this peer group, differences in pension benefits are therefore determined by variations in individual employees' average daily compensation during the final compensation period, rather than by the

relative amount of time the employees worked. An employee becomes entitled to a greater pension benefit than his or her peers by being compensated at higher rate, not by working more days. This is so because the calculation required by section 31461 assumes that all employees have worked the same number of days — that is, "the average number of days ordinarily worked by persons in the same grade or class of positions during the period" — and excludes overtime pay earned outside of "normally scheduled or regular working hours." (§§ 31461, subd. (a), 31461.6, subd. (a).)

Given this fundamental definition, the inclusion in final compensation of the items of compensation excluded or limited by the PEPRA amendment can be viewed as distorting the pension calculation and increasing pension benefits beyond the amount anticipated by the underlying theory of compensation earnable. Section 31461, subdivision (b)(2), for example, limits the inclusion of payments for unused leave time in compensation earnable to the amount "earned and payable . . . during the final average salary period, regardless of when reported or paid." Restricting the inclusion of such payments to those earned in the final compensation period promotes the underlying theory established by the general language of section 31461. Leave time earned prior to the final compensation period is, necessarily, awarded in return for work performed prior to that period. The receipt of cash-out payments for such leave time during the final compensation period therefore has the effect of shifting compensation for that earlier work into the final compensation period, thereby artificially inflating the days of compensation received during the final compensation period. This is incompatible with the general approach of section 31461,

78

which calculates pensionable compensation on the basis of the same work time for every employee within a pay class. Limiting the inclusion of such payments in the compensation earnable calculation to the amount "earned and payable" during the final compensation period, as required by section 31461, subdivision (b)(2), reduces the potential for distortion from this type of compensation. (See *Alameda Sheriffs*, *supra*, 19 Cal.App.5th at pp. 97–98 ["the touchstone for calculating compensation earnable is still the compensation that was actually *earned* by the retiring employee in 'the period under consideration' "].)[31] It is noteworthy that, since 1995, CERL has treated payments from a deferred compensation plan in this manner, deeming deferred compensation to be included in compensation "when earned, rather than when paid." (§ 31461, subd. (a); see Stats.

---

[31] The Court of Appeal interpreted section 31461, subdivision (b)(2) to permit the inclusion of an unlimited amount of cashed out leave time in compensation earnable, regardless when accrued, by holding that the phrase "earned and payable" in subdivision (b)(2) modifies "leave cash-outs," rather than the leave time itself. It then concluded that the cash-out is earned when paid, rather than when the leave time is accrued. (*Alameda Sheriffs*, *supra*, 19 Cal.App.5th at pp. 98-100.) Although, in practice, an employee can accrue only a limited amount of leave time in a final compensation period, there is no similar practical constraint on the amount of leave time that can be cashed out during that time. The Court of Appeal's interpretation therefore renders subdivision (b)(2) pointless, and an "interpretation of statutory language that renders the language useless" is, of course, disfavored. (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 354.) A better reading requires "earned and payable" to refer to the amount of leave time that can be accrued during the final compensation period.

1995, ch. 558, § 1.) Subdivision (b)(2) is consistent with this approach and serves the underlying theory of compensation earnable in the same manner.

A comparable rationale supports the enactment of section 31461, subdivision (b)(3), which excludes "[p]ayments for additional services rendered outside of normal working hours." Section 31461 bases compensation earnable on the same number of days worked for all employees within a particular pay grade. The long-standing exclusion of overtime from compensation earnable, now embodied in section 31461.6, confirms that an employee's pensionable compensation is generally to be based on pay for work performed during normal working hours.[32] Consistently with this exclusion of overtime, subdivision (b)(3) requires the exclusion of compensation for other services rendered outside normal working hours. This restriction prevents employees from volunteering, during their final compensation period, to perform additional services outside normal working hours in order to artificially inflate their daily rate of pay. Subdivision (b)(3) therefore reinforces the portion of section 31461 that requires compensation earnable to be based on the same work year for all employees within a particular pay grade.

---

[32] This understanding is reinforced by the text of section 31461.6, which excludes "overtime premium pay" unless the pay is received as compensation "for hours worked within the normally scheduled or regular working hours that are in excess of the statutory maximum workweek." (*Id.*, subd. (a).) In other words, overtime pay is not excluded if it is earned by an employee as part of his or her "normally scheduled or regular working hours." (*Ibid.*) Only payment for excess hours, as compared to the employee's peers, is excluded.

Finally, section 31461, subdivision (b)(1) excludes compensation "paid to enhance a member's retirement benefit." As discussed above, the three examples of potentially excludable compensation provided in subdivision (b)(1)(A) through (C) demonstrate that this section is intended to prevent various forms of manipulation of the compensation earnable calculation. Subdivision (b)(1)(A) categorizes as suspicious cash compensation received in lieu of a benefit that had previously been provided in kind. This practice has the effect of converting a nonpensionable benefit into pensionable compensation. Subdivision (b)(1)(B) calls attention to "one-time or ad hoc payment[s]" made to an employee but not to peers. The ad hoc and exclusive nature of the payment presumably signals the possibility of manipulation of the pension calculation. Subdivision (b)(1)(C) casts doubt on payments that are made solely due to termination yet are paid prior to termination. This practice would shift such compensation into the final compensation period, again converting a nonpensionable benefit into pensionable compensation. The common thread is the alteration of the normal pattern of an employee's compensation for the purpose of increasing the compensation received during the final compensation period. The exclusion mandated by subdivision (b)(1) therefore reinforces the requirement in section 31461 that an employee's pension benefits be based on his or her compensation. As the word implies, "compensation" is money paid in return for the performance of services. If a payment is made to an employee for the purpose of enhancing his or her pension benefit, it is not paid in return for the delivery of services but for another purpose entirely — to boost the employee's postemployment pension benefits. This is clear

pension abuse, and the express exclusion of such payments from compensation earnable is fully consistent with the theory underlying section 31461.

As the preceding discussion demonstrates, the exclusions introduced by PEPRA unquestionably "bear [a] material relation to the theory of a pension system and its successful operation." (*Allen I, supra*, 45 Cal.2d at p. 131; see *Claypool v. Wilson* (1992) 4 Cal.App.4th 646, 666 [a valid justification for changing a pension system "must relate to considerations internal to the pension system"].) The definition of compensation earnable is a critical element in the calculation of pension benefits. The interplay of those elements is the very embodiment of "the theory of [the CERL] pension system," and a workable definition of compensation earnable is crucial to "its successful operation." (*Allen I*, at p. 131.) Further, as the Legislature explained in passing the amendments, the amendment was designed to limit pension spiking, the manipulation of compensation to artificially increase a pension benefit. Unquestionably, preventing manipulation of the terms of a pension plan to produce outsize benefits is a substantively proper reason for modifying the plan, since it serves to maintain the system's financial integrity and discourage gamesmanship in the management of compensation practices.

### c. *The Legislature was not constitutionally required to offset the disadvantages imposed by PEPRA's amendment of section 31461 with comparable advantages*

In featuring a properly motivated pension modification that imposes uncompensated financial disadvantages on plan participants, this matter requires us to address for the first time

the interplay of the two parts of the *Allen I* test. There is no doubt that *Allen I* requires a modification of public employee pension rights to have been properly motivated — that is, to have been enacted "for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system" and to "bear some material relation to the theory of a pension system and its successful operation." (*Allen I, supra,* 45 Cal.2d at p. 131.) Less clear is the role of the second part of the test, the offsetting of financial disadvantages with comparable new advantages. Because neither *Allen I* nor any of our subsequent pension decisions has featured a properly motivated pension modification that failed to provide comparable advantages to offset its disadvantages, we have never ruled on the constitutionality of such a modification. The ruling of *Allen I* that disadvantages "should," rather than "must," be offset by comparable new advantages implies that the contract clause does not *invariably* require offsetting advantages, but we have never addressed the circumstances under which such advantages need not be provided.

Because we have concluded that the PEPRA amendment was enacted for a constitutionally permissible purpose yet imposes uncompensated financial disadvantages, we must now turn to this unresolved issue. For reasons explained below, we conclude that the contract clause requires a properly motivated pension modification to provide comparable new advantages to offset any financial disadvantages unless to do so would undermine, or would otherwise be inconsistent with, the constitutionally permissible purpose underlying the

83

modification.  Further, we hold that the PEPRA amendment at issue here is constitutional under this analysis.

> 1. *A modification of public employee pension*
>    *rights will not be sustained under the*
>    *contract clause solely because it serves a*
>    *constitutionally permissible purpose*

It is possible to read *Allen I* to suggest that a modification of public employee pension rights that is properly motivated is constitutional, regardless of its imposition of uncompensated disadvantages.  Under such an interpretation, our analysis would end here, since we have concluded that the PEPRA amendment serves a constitutionally permissible purpose.  Two considerations dissuade us from such a reading.

The first is the use by *Allen I* of "should" in connection with the first part of its test, that "changes in a pension plan which result in disadvantage to employees *should* be accompanied by comparable new advantages." (*Allen I, supra,* 45 Cal.2d at p. 131, italics added.)  If the use of "should" by *Allen I* is not to be disregarded as merely precatory, it must be understood to mean, at a minimum, that although some properly motivated pension modifications that fail to provide comparable advantages will pass constitutional scrutiny, others will not.  Further, although this language implies that the enactment of comparable advantages is not an invariable constitutional requirement, the use of such a strongly directive word suggests that comparable advantages are preferred. Speaking generally, modifications of public employee pension plans "should" preserve the value of plan participants' pension rights.

Second, as we emphasized in *Allen I*, the ultimate test for modifications to a public pension plan under the contract clause is reasonableness: "Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change." (*Allen I*, *supra*, 45 Cal.2d at p. 131.) Even when a court finds that a pension modification was enacted for a constitutionally proper purpose, that alone does not ensure its reasonableness. A further test must be interposed to ensure that any imposition of uncompensated financial disadvantages on plan participants as a result of the properly motivated pension modification is reasonable.

> ### 2. *Modifications to a public employee pension plan that serve a proper purpose yet impose uncompensated disadvantages will be sustained only if providing comparable advantages would undermine, or would otherwise be inconsistent with, their constitutionally permissible purpose*

The contract clause protects from substantial impairment public employees' implied contractual rights in their pension benefits. Despite this protection, we have long recognized that public employees' pension benefits are not immutable, "since pension systems must be kept flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system and carry out its beneficent policy." (*Kern, supra*, 29 Cal.2d at pp. 854–855.) At times, those adjustments may incidentally reduce the value of employees' pension rights. As we recognized in *Allen I*, this does not necessarily mean that the adjustments are unconstitutional.

It might have been possible to adopt a rule requiring that any disadvantages imposed by a pension modification *must* be

offset by comparable new advantages. But in *Kern* we effectively disavowed such a rule, holding, "The employee does not have a right to any fixed or definite benefits, but only to a substantial or reasonable pension. There is no inconsistency therefore in holding that he has a vested right to a pension but that the amount, terms and conditions of the benefits may be altered." (*Kern, supra*, 29 Cal.2d at p. 855.) Plainly, however, the recognition that pension benefits are not immune from change does not grant carte blanche to the Legislature. As discussed at length above, the California Rule has two components: The Legislature must act for a proper purpose and the net level of benefits "should" be preserved. (*Allen I, supra*, 45 Cal.2d at p. 131.) The logical implication of the latter component is that the contract clause requires the level of pension benefits to be preserved if it is feasible to do so without undermining the Legislature's permissible purpose in enacting the pension modification.

This requirement gives substance to the instruction in *Allen I* that the disadvantages created by a pension modification "*should* be accompanied by comparable new advantages." (*Allen I, supra*, 45 Cal.2d at p. 131, italics added.) When the Legislature can feasibly preserve the value of public employee pension rights by providing comparable new advantages — that is, when providing such advantages is not inconsistent with the constitutionally permissible purpose of the changes — the Constitution requires it to do so. On the other hand, when providing comparable new advantages would undermine, or would otherwise be inconsistent with, the constitutionally permissible purpose of the change, the contract clause imposes no requirement that the Legislature frustrate its permissible

purpose by providing comparable new advantages. Such modifications will be upheld under our Constitution despite the financial disadvantage they impose on public employee pension benefits.

This rule is consistent with our past constitutional rulings on the power of the state to impair its own contracts. We have always recognized that such impairments may survive contract clause scrutiny, but we have also held that they are subject to significant constraints. " '[A] State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.' " (*Sonoma Employees*, *supra*, 23 Cal.3d at p. 308, quoting *U.S. Trust*, *supra*, 431 U.S. at pp. 30–31.) When preserving the value of public employee pension rights does not disserve the Legislature's constitutionally permissible pension reform objectives, the contract clause requires it to preserve that value.

3. *Requiring the provision of comparable new advantages would undermine the constitutionally permissible purpose of the PEPRA amendment*

PEPRA provided no new advantages to existing county employees to offset any impact of the exclusions and limitations in new subdivision (b)(1) through (3) of section 31461. As indicated above, however, we conclude that providing such advantages would have undermined the amendment's constitutionally permissible purpose. Accordingly, the PEPRA amendment did not violate the contract clause of our Constitution, notwithstanding the failure of the Legislature to

provide new features to offset the financial disadvantages of the PEPRA amendment.

The purpose of PEPRA's amendment of section 31461 was not to change in any fundamental way the implementation of the CERL pension system. Save for the exclusion of a few items from pensionable compensation, CERL operates as it did before PEPRA. Nor was it to reduce the cost burden of the system on counties, other than incidentally. Rather, as explained above, the purpose was to bring administrative practice under section 31461 into closer alignment with the system's underlying theory by excluding income designed to artificially inflate a pension benefit (§ 31461, subd. (b)(1)) and limiting the inclusion of other types of compensation that were reasonably viewed as inconsistent with CERL's general approach to pensionable compensation (§ 31461, subd. (b)(2), (3)). Stated differently, the Legislature was attempting to reduce manipulation and abuse by closing loopholes created by the very general language of sections 31460 through 31462, which define "compensation," "compensation earnable," and "final compensation." Each of the changes in subdivision (b)(1) through (3) is arguably inherent in the overall intent of section 31461, but the failure of the statute expressly to address these specific circumstances left their fate to the interpretations of 20 individual county retirement boards. This was exacerbated after our decision in *Ventura County* confirmed and gave effect to the broadly inclusive language of sections 31460 and 31461. PEPRA's amendment compels uniformity on the issues it addresses, guaranteeing that compensation earnable will be implemented consistently with the Legislature's intent in each CERL county.

88

It would be anomalous, at best, to hold that the Constitution requires current employees to be provided an equivalent advantage to mitigate the effect of eliminating from compensation earnable payments that, in the view of the Legislature, are inconsistent with the theory underlying the pension system. Requiring comparable advantages would be wholly inconsistent with the Legislature's purpose by restoring in some form advantages that, in the view of the Legislature, should not have been available to county employees in the first place.

Experience with the implementation of a statutory pension system will inevitably reveal the need for change to close loopholes and foreclose opportunities for abuse. The Legislature must have the authority, discretion, and flexibility to address such problems without being required to, in effect, extend the life of the loopholes and the opportunities for abuse for the duration of the careers of current employees by providing comparable advantages. (See *Pomona Police Officers' Assn. v. City of Pomona* (1997) 58 Cal.App.4th 578, 587 [Legislature amended CalPERS governing statute "to curb certain perceived pension abuses [by] local governments"].) Because requiring comparable advantages under these circumstances would significantly undermine the Legislature's constitutionally permissible purpose, the contract clause imposes no such requirement.

## III. DISPOSITION

The State, at least implicitly, and amicus curiae California Business Roundtable, explicitly, urge us to use this decision as an occasion to reexamine and revise the California Rule, arguing that the rule constitutes an improper interpretation of the contract clause and bad public policy. Because we conclude that PEPRA's amendment of CERL did not violate the contract clause under a proper application of the California Rule, however, we have no jurisprudential reason to undertake a fundamental reexamination of the rule. The test announced in *Allen I*, as explained and applied here, remains the law of California.

For the reasons stated above, we reverse the decision of the Court of Appeal and remand the matter to that court, with directions to remand to the trial court to vacate the judgments entered in each of the three consolidated proceedings and to conduct further proceedings consistent with this decision.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

ALAMEDA COUNTY DEPUTY SHERIFF'S ASSN. v.
ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSN.

S247095


Concurring Opinion by Justice Cuéllar


This case resolves a constitutional challenge to a recent amendment of the County Employees Retirement Law of 1937 (Gov. Code, § 31450 et seq.). (See Stats. 2012, ch. 296, § 28.) What the amendment does is reduce county employees' pension rights by narrowing the definition of "compensation earnable." (Gov. Code, § 31461). What the amendment does not do is provide any comparable new advantages to county employees. We uphold the change nonetheless, in this quite particular situation: The definitional change was enacted for a constitutionally permissible purpose — one that would have been undermined by the provision of any offsetting financial advantage for employees. (See maj. opn., *ante*, at pp. 87-89.)

Two points are worth bearing in mind as one reads the court's legal analysis in the context of this particular statutory amendment. First, the test the court applies here is merely a specific application, fit for this situation, of a more general inquiry: whether a reduction in pension rights without any comparable new advantages is "reasonable" and "necessary" to further "an important state interest." (*Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 308; see maj. opn., *ante*, at pp. 43, 45, 51, 85.) Modifications to pension rights present many complexities, and courts must determine their validity " 'upon the facts of each case.' " (Maj. opn., *ante*, at p. 85, quoting *Allen v. City of Long*

*Beach* (1955) 45 Cal.2d 128, 131.)   Second, at no point did plaintiffs in this case attempt to show the amended definition was unnecessary to achieve the Legislature's permissible purpose, or was otherwise unreasonable.

With that understanding, I concur in the Chief Justice's opinion for the court.

**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XX 19 Cal.App.5th 61
**Rehearing Granted**

_____

**Opinion No.** S247095
**Date Filed:** July 30, 2020

_____

**Court:**  Superior
**County:**  Contra Costa
**Judge:**  David B. Flinn

_____

**Counsel:**

Mastagni Holstedt, Mastagni, Holstedt, Amick, Miller & Associates, David P. Mastagni, David E. Mastagni and Isaac S. Stevens for Plaintiffs and Appellants Alameda County Deputy Sheriff's Association, Jon Rudolph, Rocky Medeiros, James Nelson and Darlene Hornsby.

Leonard Carder, Peter Saltzman and Arthur Liou for Plaintiffs and Appellants Public Employees Union, Local 1, International Federation of Professional and Technical Engineers, Local 21, Alameda County Management Employees' Association, David M. Rolley, Peter J. Ellis and Susan Guest.

Rains, Lucia & Willinson, Rains Lucia Stern, St. Phalle & Silver, Rockne A. Lucia, Jr., Timothy K. Talbot, Steven M. Betz and Zachery A. Lopes for Plaintiffs and Appellants Contra Costa County Deputy Sheriffs Association and Ken Westermann.

Weinberg, Roger & Rosenfeld, Anne I. Yen, Vincent A. Harrington, Jr. and Kerianne Steele for Plaintiffs and Appellants Service Employees International Union, Local 1021 and Building Trades Council of Alameda County.

Bogatin Corman & Gold and William I. Corman for Plaintiffs and Appellants Physicians' and Dentists' Organization of Contra Costa.

Davis, Cowell & Bowe, McCracken, Stemerman & Holsberry and W. David Holsberry for Plaintiffs and Appellants United Professional Fire Fighters of Contra Costa County, Local 1230.

Beeson, Tayer & Bodine, Beeson, Tayer, Silbert & Bodine, Robert Bonsall, Vishtasp Soroushian, Teague P. Paterson and Adrian Barnes for Plaintiffs and Appellants AFSCME Local 512, AFSCME Local 2700, Teamsters Local 856, Hasani Tabari, Sandra Gonzalez-Diaz and Daniel Lister.

Bennett, Sharpe, Delarosa, Bennett & Licalsi, Law Offices of Bennett & Sharpe, Barry J. Bennett, Thomas M. Sharpe,  Katwyn T. DeLaRosa for Plaintiffs and Appellants American Federation of State, County and Municipal Employees, Local 2703, AFL-CIO, Merced County Sheriff's Association, an affiliate of International Brotherhood of Teamsters, Local 856, Jeffrey Miller and Mary McWatters.

Messing Adam & Jasmine, Gary M. Messing, Gregg McLean Adam and Yonatan L. Moskowitz for CAL FIRE, Local 2881, California Correctional Peace Officers Association, Peace Officers Research Association of California, California Statewide Law Enforcement Association, San Francisco Police Officers' Association, San Jose Police Officers' Association, Fresno Deputy Sheriffs' Association, Deputy Sheriffs' Association of Santa Clara County, Marin Professional Firefighters, International Association of Fire Fighters, Local 1775, Association of California State Supervisors, San Francisco Municipal Executives' Association, San Francisco Deputy Probation Officers' Association, Sunnyvale Public Safety Officers' Association, Superior Court Professional Employees' Association of the County of Santa Clara, Sacramento County Professional Accounts Association, City of Fremont Employees' Association, Redwood City Management Employees' Association, Burlingame Police Officers' Association and California State Retirees as Amici Curiae on behalf of Plaintiffs and Appellants.

Reich, Adell & Cvitan, Marianne Reinhold, Laurence S. Zakson and Aaron G. Lawrence for Orange County Attorneys Association and Orange County Managers Association as Amici Curiae on behalf of Plaintiffs and Appellants.

Law Offices of Robert J. Bezemek, Robert J. Bezemek and David Conway for the Peralta Retirees Organization, the California Community Colleges Independents' Organization and the Faculty Association of the California Community Colleges as Amici Curiae on behalf of Plaintiffs and Appellants.

Reed Smith, Harvey L. Leiderman, Jeffrey R. Rieger and May-tak Chin for Defendants and Respondents Alameda County Employees' Retirement Association and Contra Costa County Employees' Retirement Association and their respective Boards of Retirement.

Nossaman, Ashley K. Dunning, Peter H. Mixon, Robert L. Gaumer, Michael V. Toumanoff, Jill N. Jaffe, Natasha Saggar Sheth and Jennifer Meeker for Defendants and Respondents Merced County Employees' Retirement Association and Merced County Employees' Retirement Association Board of Retirement.

Kamala D. Harris and Xavier Becerra, Attorneys General, Douglas J. Woods and Thomas S. Patterson, Assistant Attorneys General, Constance L. LeLouis and Anthony P. O'Brien, Deputy Attorneys General, Peter Krause, Legal Affairs Secretary, Rei R. Onishi, Deputy Legal Affairs Secretary for Intervener and Appellant State of California.

Jones Day, Beth Heifetz, G. Ryan Snyder and Karen P. Hewitt for California Business Roundtable as Amicus Curiae on behalf of Intervener and Appellant State of California.

Colantuono, Highsmith & Whatley, Michael G. Colantuono and Liliane M. Wyckoff for League of California Cities as Amicus Curiae on behalf of Intervener and Appellant State of California.

Meyers, Nave, Riback, Silver & Wilson, Richard D. PioRoda, Kenton L. Alm; Renee Sloan Holtzman Sakai; Renee Public Law Group, Linda M. Ross and Randy Riddle for Real Party in Interest Central Contra Costa Sanitary District.

Atkinson, Andelson, Loya, Ruud & Romo, Anthony P. De Marco and Joshua E. Morrison for Association of California School Administrators as Amicus Curiae.

Greines, Martin, Stein & Richland and Timothy T. Coates for Los Angeles County Employees Retirement Association as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Rei Onishi
Office of Governor Gavin Newsom
State Capitol, Suite 1173
Sacramento, CA 95814
(916) 445-0873

David E. Mastagni
Mastagni Holstedt
1912 I Street
Sacramento, CA 95811
(916) 446-4692

Timothy K. Talbot
Rains Lucia Stern St. Phalle & Silver
2300 Contra Costa Blvd., Suite 500
Pleasant Hill, CA 94523
(925) 609-1699